**ORIGINAL**

1  Steven D. Hemminger (SBN 110665)
   steve.hemminger@alston.com
2  **ALSTON + BIRD LLP**
   Two Palo Alto Square
3  3000 El Camino Real, Suite 400
   Palo Alto, California  94306
4  Telephone: (650) 838-2000
   Facsimile:  (650) 838-2001
5
   Michael P. Kenny (mike.kenny@alston.com)
6  Debra D. Bernstein (debra.bernstein@alston.com)
   Rodney J. Ganske (rod.ganske@alston.com)
7  Elizabeth H. Jordan (elizabeth.jordan@alston.com)
   Matthew D. Kent (matthew.kent@alston.com)
8  **ALSTON + BIRD LLP**
   1201 West Peachtree Street
9  Atlanta, Georgia  30309-3424
   Telephone: (404) 881-7000
10 Facsimile:  (404) 881-7777

11 *Attorneys For Plaintiffs Dell Inc. and Dell Products L.P.*

12                **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
13                  **SAN FRANCISCO DIVISION**

14 DELL INC. and DELL PRODUCTS L.P.,            CV 10      1064

15                Plaintiffs,          )  CASE NO.:
16       v.                           )
                                       )
17 SHARP CORPORATION; SHARP ELECTRONICS )
   CORPORATION; HITACHI DISPLAYS, LTD.;  )  **COMPLAINT**
18 HITACHI ELECTRONIC DEVICES (USA), INC.; )
   HITACHI, LTD.; EPSON IMAGING DEVICES  )  **DEMAND FOR JURY TRIAL**
19 CORPORATION; EPSON ELECTRONICS        )
   AMERICA, INC.; HANNSTAR DISPLAY       )
20 CORPORATION; TOSHIBA AMERICA          )
   ELECTRONIC COMPONENTS, INC.; TOSHIBA  )
21 AMERICA INFORMATION SYSTEMS, INC.;    )
   TOSHIBA CORPORATION; and TOSHIBA      )
22 MOBILE DISPLAY CO., LTD.,             )
                                         )
23                Defendants.           )
   _____  )

24

25                        **COMPLAINT**

26     Dell Inc. and Dell Products L.P. ("Dell") bring this action for damages and injunctive relief

27 under the antitrust laws of the United States, under various state antitrust, unfair competition and

28 consumer protection laws, and for unjust enrichment and breach of contract, against the Defendants

                                1

1 named herein. Dell alleges the following based on its personal knowledge, detailed investigation by

2 counsel, and publicly available materials from *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, M:07-

3 1827-SI, including all guilty pleas and indictments, and upon information and belief.

4 **I. INTRODUCTION**

5 1. Dell brings this action on behalf of itself and its affiliates to recover for antitrust and

6 other harms arising from billions of dollars of purchases at artificially inflated prices, over several

7 years, of Thin Film Transistor-Liquid Crystal Display ("TFT-LCD") panels, or products containing a

8 TFT-LCD panel. TFT-LCD panels are made by sandwiching liquid crystal compound between two

9 pieces of glass called substrates. The resulting screen contains hundreds or thousands of electrically

10 charged dots, called pixels, that form an image. This panel is then combined with a backlight unit, a

11 driver, and other equipment to create a "module" that enables the panel to operate and be integrated

12 into a product. Dell buys TFT-LCD panels for use in a number of its products. As used herein, "TFT-

13 LCD Product(s)" refers to TFT-LCD panels and/or products containing TFT-LCD panels.

14 2. The Defendants and their co-conspirators combined and conspired to sell TFT-LCD

15 Products to Dell at artificially inflated prices, and, in fact, did sell Dell those products at artificially

16 inflated prices. As a result, Dell seeks to recover compensatory damages for the period between

17 approximately January 1, 1996 and the present (the "Relevant Period") related to Dell's purchases of

18 TFT-LCD Products from the Defendants and their subsidiaries or affiliates, or any of the Defendants'

19 co-conspirators.

20 3. On November 12, 2008, the United States Department of Justice ("DOJ") announced

21 that Sharp Corporation, Chunghwa Picture Tubes, Ltd., and LG Display Co. Ltd. (and its wholly

22 owned subsidiary, LG Display America, Inc.) agreed to plead guilty to violating Section 1 of the

23 Sherman Act (15 U.S.C. § 1) for conspiring to fix the prices of TFT-LCD Products. These companies

24 agreed to pay criminal fines of more than $585 million. On March 10, 2009, the DOJ announced that

25 Hitachi Displays Ltd. agreed to plead guilty and pay a $31 million fine. On August 25, 2009, Epson

26 Imaging Devices Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in

27 the conspiracy to fix the prices of TFT-LCD Products. On February 8, 2010, Chi Mei Optoelectronics

28 pled guilty and agreed to pay a $220 million criminal fine for its role in the conspiracy to fix the prices

2

1  of TFT-LCD Products.  Since November 12, 2008, numerous executives of the foregoing companies

2  have pled guilty to price fixing or have been indicted.  To date, the price-fixing companies have agreed

3  to pay criminal fines of more than $860 million.  The DOJ's criminal investigation is ongoing.

4      4.      In their respective pleas, Defendants Sharp Corporation and Hitachi Displays Ltd.

5  specifically admitted that they had overcharged Dell for TFT-LCD Products.  Sharp Corporation

6  admitted to targeting Dell (and other U.S. companies) and overcharging Dell for TFT-LCD Products it

7  purchased.  Hitachi Displays Ltd. also admitted to targeting Dell and overcharging Dell for TFT-LCD

8  Products it purchased.  Both Sharp Corporation and Hitachi Displays Ltd. admitted that acts committed

9  in furtherance of its conspiracy were carried out in the United States.

10      5.      As explained herein, the Defendants and their co-conspirators fraudulently concealed

11  their price-fixing conspiracy and Dell only learned of the conspiracy, and then only in general terms,

12  when the DOJ's investigation came to light in December 2006.

13      6.      TFT-LCDs are manufactured in fabrication plants, or "fabs," as they are known in the

14  industry.  Fabrication plants are very expensive.  The number of panels produced has a direct and

15  substantial effect on the price of both raw TFT-LCD panels as well as the products into which they are

16  placed.  Although TFT-LCD panels are used in different products, the TFT-LCD production process is

17  such that manufacturers' output and prices can be measured in a consistent and homogeneous way.

18  These and other conditions in the TFT-LCD industry enabled the price-fixing conspiracy detailed in

19  this Complaint.  In particular, these conditions enabled the Defendants and their co-conspirators to

20  engage in direct discussions about the prices to be charged for TFT-LCD Products.  Additionally, these

21  conditions made it economically feasible to maintain artificially high prices through manipulation of

22  supply.

23      7.      Beginning in at least 1996, Defendants, including but not limited to Hitachi, Sharp and

24  Toshiba, met or talked with at least one other Defendant or co-conspirator in order to agree on TFT-

25  LCD Product prices and the amount of TFT-LCD Products each would produce.  As production in

26  Korea began to increase, the Defendants and their co-conspirators expanded their meetings to involve

27  their new competitors, including LG Display and Samsung, which also agreed to fix prices and to

28  control supply.  In 2001, the Defendants or their co-conspirators convinced Taiwanese TFT-LCD

3

1  Product manufacturers, including AU Optronics, Chi Mei, Chunghwa, and HannStar, to join the
2  conspiracy to fix prices and to control product supply. The unlawful conspiracy included agreements
3  on the prices at which Defendants and their co-conspirators would sell TFT-LCD Products to their own
4  corporate subsidiaries and affiliates, as well as one another, thereby ensuring that TFT-LCD Product
5  prices remained consistent among the conspirators, and thus preventing any price discrepancies to
6  customers.

7      8.      Throughout the Relevant Period, the price-fixing conspiracy was effective in
8  forestalling the normal downward pressures on prices for TFT-LCD Products caused by natural
9  competitive market forces and periods of oversupply and technological change. The unlawful
10  conspiracy resulted in unusually long periods of high prices and high profits for the Defendants and
11  their co-conspirators. As a result of Defendants' and their co-conspirators' unlawful conduct, Dell
12  paid higher prices for TFT-LCD Products than it would have paid in a competitive market.

13      **II.      JURISDICTION AND VENUE**

14      9.      Dell brings this action to obtain injunctive relief and to recover damages, including
15  treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' and their co-
16  conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Dell also seeks to recover all
17  appropriate damages for Defendants' and their co-conspirators' violations of state antitrust and unfair
18  competition and consumer protection statutes, for Defendants' unjust enrichment, and for Sharp's,
19  Hitachi's and Toshiba's respective breaches of contract.

20      10.      The activities of Defendants and their co-conspirators, as described herein, involved
21  U.S. import trade or commerce or were within the flow of, were intended to, and did have a direct,
22  substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce. In
23  particular, the conspiracy directly and substantially affected the price of TFT-LCD Products purchased
24  in the United States, thereby giving rise to Dell's antitrust claims.

25      11.      To the extent applicable, jurisdiction exists under the Foreign Trade and Antitrust
26  Improvement Act, 15 U.S.C. § 6a, because Defendants' and their co-conspirators' conduct had a direct,
27  substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect
28  gave rise to Dell's claims alleged herein.

4

1    12.    During the Relevant Period, Defendants and their co-conspirators collectively
2  controlled a vast majority of the market for TFT-LCD Products, both globally and in the United States.

3    13.    Defendants and their co-conspirators shipped millions of TFT-LCD Products worth
4  billions of dollars into the United States each year during the Relevant Period. As a result, a
5  substantial portion of Defendants' and their co-conspirators' revenues was derived from the U.S.
6  market. Defendants and their co-conspirators spent hundreds of millions of dollars on advertising their
7  products in the United States. Most, if not all, Defendants had marketing, sales, and account
8  management teams specifically designated to handle U.S. customer accounts, including Dell, and the
9  U.S. market for TFT-LCD Products. Because of the importance of the U.S. market to Defendants and
10  their co-conspirators, TFT-LCD Products intended for importation into and ultimate consumption in
11  the United States were a focus of Defendants' and their co-conspirators' illegal conduct.

12    14.    When high-level executives based at Defendants' and their co-conspirators' Asian
13  headquarters agreed on prices, they knew that their price-fixed TFT-LCD panels would be
14  incorporated into TFT-LCD Products sold in the United States. Defendants and their co-conspirators
15  knew that price increases for TFT-LCD panels would necessarily result in increased prices for TFT-
16  LCD Products sold in the United States. Many Defendants and their co-conspirators manufactured
17  TFT-LCD Products and sold them in the United States. In fact, Defendants and their co-conspirators
18  routinely monitored the effect their price fixing had on the prices of TFT-LCD Products sold in the
19  United States, which they often referred to as "street prices," because Defendants and their co-
20  conspirators were aware that the conspiracy would raise the prices of both TFT-LCD panels and
21  products. In addition, Defendants and their co-conspirators used TFT-LCD Product pricing in the
22  United States as a benchmark for establishing, organizing, and tracking their price-fixing of TFT-LCD
23  panels.

24    15.    The Defendants knowingly and intentionally sent price-fixed TFT-LCD Products into a
25  stream of commerce that lead directly into the United States. Many TFT-LCD panels were intended
26  for incorporation into finished products specifically destined for sale and use in the United States. This
27  conduct by Defendants and their co-conspirators was meant to produce, and did in fact produce, a
28  substantial effect in the United States in the form of artificially-inflated prices for TFT-LCD Products.

5

16. During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold TFT-LCD Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into the Northern District of California.

17. Defendants and their co-conspirators have acknowledged that, by intentionally sending TFT-LCD products into the United States, their commercial activities have had an impact on American import trade and import commerce. Defendants Sharp Corporation, Hitachi Displays Ltd. and Epson Imaging Devices Corporation and several of their co-conspirators, LG Display Co. Ltd., LG Display America, Inc., Chi Mei Optoelectronics Corporation and Chunghwa Picture Tubes, Ltd., admitted during their plea hearings that acts in furtherance of the conspiracy were carried out in California. In their respective Plea Agreements, LG Display Co. Ltd. (and its wholly owned subsidiary, LG Display America, Inc.), Sharp Corporation, Epson Imaging Devices Corporation, Hitachi Displays Ltd., Chi Mei Optoelectronics and Chunghwa Picture Tubes, Ltd. each agreed that: "[a]cts in furtherance of this conspiracy were carried out within the Northern District of California. TFT-LCD affected by this conspiracy was sold by one or more of the conspirators to customers in this District."

18. In addition, in a series of complaints filed with the U.S. International Trade Commission over the past few years, Samsung and Sharp have both alleged infringing conduct based on "[t]he importation into the United States, sale for importation into the United States, and/or sale after importation in the United States of . . . LCD devices" by the other (and by other entities on its behalf).

19. LG Display America, Inc., which admitted to participating in the price-fixing conspiracy, maintains its principal place of business in San Jose, California. Defendant Epson Imaging Devices Corporation, which admitted to participating in the conspiracy, used a California corporation with its principal place of business in California (Epson Electronics America, Inc.), as its sales agent in the United States for TFT-LCD Products containing LCD panels which were affected by the conspiracy. Similarly, co-conspirator Chunghwa Picture Tubes, Ltd., which also admitted to participating in the conspiracy, used a California corporation with its principal place of business in California (Tatung Company of America, Inc.), as its sales agent in the United States for TFT-LCD Products containing LCD panels which were affected by the conspiracy. Many of the other

6

Defendants and co-conspirators also maintained offices and operations in California during the Relevant Period, including: AU Optronics Corporation America, Inc., Chi Mei Optoelectronics USA, Inc., Nexgen Mediatech USA, Inc., Samsung Semiconductor, Inc., Toshiba America Electronic Components, Inc. and Toshiba America Information Systems, Inc.  Communications in furtherance of the conspiracy occurred within California and other states.

20.    For the reasons set forth above, the business activities of the Defendants and their co-conspirators had a direct, substantial, and reasonably foreseeable effect on U.S. commerce and caused antitrust injury in the United States.

21.    The Court has subject matter jurisdiction over Dell's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

22.    Dell also brings this action pursuant to the antitrust and unfair competition laws of Nevada, North Carolina and Tennessee.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Dell's state antitrust and unfair competition claims set forth below.  These state law claims are so related to Dell's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

23.    The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in Nevada, North Carolina and Tennessee.  In particular, Defendants' and their co-conspirators' unlawful conspiracy directly and substantially affected the price of TFT-LCD Products purchased in Nevada, North Carolina and Tennessee.  Dell maintained substantial operations and received TFT-LCD Products from the Defendants or their co-conspirators in these states during the Relevant Period.  These effects also give rise to Dell's antitrust claims.

24.    As a nationwide corporation with substantial operations and purchases in all of these states during the relevant period, Dell is entitled to the protection of the antitrust and unfair competition laws of each of the above-mentioned states.

25.    Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to

7

1 Dell's claims occurred in this district, and a substantial portion of the affected interstate trade and
2 commerce was carried out in this district.

3      26.    Venue also is proper in this district because multiple class action cases related to the
4 same conduct at issue, generally naming the same Defendants and their co-conspirators, have been
5 filed in and consolidated in this district in *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, M:07-
6 1827-SI. Multiple criminal cases are pending against the Defendants and their co-conspirators in this
7 district related to the conduct at issue, and many of the Defendants and their co-conspirators have
8 already pled guilty to pricing fixing, some against Dell specifically, in this district.

9      27.    Defendants are subject to the jurisdiction of this Court by virtue of their nationwide
10 contacts and other activities, as well as their contacts with the State of California.

11      28.    Because Dell's action is related to the *In Re TFT-LCD (Flat Panel) Antitrust Litigation*
12 action, M:07-1827-SI, this action will be assigned to the San Francisco division, Judge Susan Illston
13 presiding. This action concerns substantially the same parties, transactions and events as Case No.
14 M:07-1827-SI insofar as it involves a suit for damages and injunctive relief arising out of the
15 conspiracy to fix the price of TFT-LCD Products in violation of the Sherman Act and the laws of
16 various states. Pursuant to Pretrial Order #1 in M:07-1827-SI, this case is automatically consolidated
17 with M:07-1827-SI for all pretrial proceedings without any further motion or order.

18 **III.    PARTIES**

19 **A.    Plaintiffs**

20      29.    Dell Inc. is a corporation duly organized under the laws of the State of Delaware, with a
21 principal place of business in Round Rock, Texas.

22      30.    Dell Products, L.P. is a Texas limited partnership with its principal place of business in
23 Round Rock, Texas.

24      31.    Dell Inc. and Dell Products, L.P. are sometimes referred to collectively herein as "Dell."

25      32.    Dell is a leading technology company, offering a broad range of products, including
26 mobility products, desktop PCs, software and peripherals, servers and networking services, and
27 storage. Dell is consistently among the United States and global leaders in supplying computer
28 systems.

8

33. During the Relevant Period, Dell was a substantial direct purchaser of TFT-LCD Products from the Defendants or their co-conspirators identified herein, including purchases of TFT-LCD panels for use in flat-panel monitors and notebook computers, as well as completed flat-panel monitors and other finished TFT-LCD Products.

34. During the Relevant Period, Dell frequently held in-person negotiations with Defendants and their co-conspirators on the price and volume of TFT-LCD Products it purchased. Dell routinely conducted these negotiations from its business headquarters in Round Rock, Texas and elsewhere. As part of these negotiations, Dell identified the type of TFT-LCD Products it required, the purchase price, and other essential contract terms. From its Texas headquarters and elsewhere, Dell would continue negotiations with suppliers, including Defendants and their co-conspirators, until an agreed-upon worldwide price was established for its TFT-LCD Product purchases.

35. During the Relevant Period, Dell also negotiated TFT-LCD Product prices with the Defendants and their co-conspirators on behalf of its system integrators who assembled devices for delivery to Dell. The price of those TFT-LCD Products was likewise artificially inflated, causing injury to Dell's business or property.

36. Dell has been specifically identified as a victim of price fixing for its purchases of TFT-LCD Products in guilty pleas from a number of the Defendants and their co-conspirators, as well as in disclosure statements made by the DOJ.

37. Dell Inc. has, or is, effectuating assignment of claims with its relevant subsidiaries and affiliates, whereby any of the antitrust or state unfair competition and consumer protection claims described in this Complaint against the Defendants and their co-conspirators, which are held by Dell's subsidiaries and affiliates, have been or will be assigned to Dell Inc.

**B. Defendants**

**1. Epson**

38. Defendant Epson Imaging Devices Corporation ("Epson Japan") has its principal place of business at 3-101, Minami-Yoshikata, Tottori-Shi, Tottori, 680-8577, Japan. The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation. Up until December 28, 2006, Epson

9

1 Japan was known as Sanyo Epson Imaging Devices Corporation. During the Relevant Period, Epson
2 Japan manufactured, marketed, sold and/or distributed TFT-LCD Products throughout the United
3 States and elsewhere.

4      39.     Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and
5 controlled subsidiary of Seiko Epson Corporation. Its principal place of business is at 2580 Orchard
6 Parkway, San Jose, California. During the Relevant Period, Epson America sold and distributed TFT-
7 LCD Products containing TFT-LCD panels manufactured by Epson Japan to customers in the United
8 States.

9      40.     Defendants Epson Japan and Epson America are referred to collectively herein as
10 "Epson." The Epson companies were members of the conspiracy that is the subject of this Complaint
11 by virtue of their participation in the conspiracy through the actions of their respective officers,
12 employees, and representatives acting with actual or apparent authority. Alternatively, defendant
13 Epson America was a member of the conspiracy by virtue of its status during the Relevant Period as
14 the alter ego or agent of Epson Japan. Epson Japan dominated or controlled Epson America regarding
15 conspiracy activities and used that domination or control to charge artificially high prices for TFT-
16 LCD panels and TFT-LCD Products.

17     **2.    HannStar**

18      41.     Defendant HannStar Display Corporation ("HannStar") is a Taiwanese company with
19 its principal place of business at No. 480, Rueiguang Road, 12th Floor, Neihu Chiu, Taipei 114,
20 Taiwan. HannStar has been in the business of manufacturing and selling TFT-LCD Products since
21 1998. During the Relevant Period, HannStar manufactured, sold, and distributed TFT-LCD Products
22 to customers throughout the United States and elsewhere.

23     **3.    Hitachi**

24      42.     Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-
25 6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original
26 producers of TFT-LCDs. In 2002, it spun off its TFT-LCD manufacturing assets to Hitachi Displays,
27 Ltd., a wholly-owned subsidiary. During the Relevant Period, Hitachi, Ltd. manufactured, sold, and
28 distributed TFT-LCD Products to customers throughout the United States and elsewhere.

10

1    43. Defendant Hitachi Displays, Ltd. is a Japanese company with its principal place of
2  business at 3300, Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays, Ltd. was
3  formed in 2002 and acquired defendant Hitachi, Ltd.'s TFT-LCD manufacturing business. Hitachi
4  Displays, Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Relevant
5  Period, Hitachi Displays, Ltd. manufactured, sold, and distributed TFT-LCD Products to customers
6  throughout the United States and elsewhere.

7    44. Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its
8  principal place of business at 208 Fairforest Way, Greenville, South Carolina. Its ultimate parent
9  company is Hitachi, Ltd. During the Relevant Period, Hitachi Electronic Devices (USA), Inc. sold and
10  distributed TFT-LCD Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to customers
11  throughout the United States and elsewhere.

12    45. Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA),
13  Inc. are sometimes referred to collectively herein as "Hitachi."

14    **4.  Sharp**

15    46. Defendant Sharp Corporation is a Japanese company with its principal place of business
16  at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. The company was one of the earliest
17  producers of TFT-LCDs. During the Relevant Period, Sharp Corporation manufactured, sold, and
18  distributed TFT-LCD Products to customers throughout the United States and elsewhere.

19    47. Defendant Sharp Electronics Corporation is a New York corporation with its principal
20  place of business at Sharp Plaza, Mahwah, New Jersey. Sharp Electronics Corporation is a wholly-
21  owned and controlled subsidiary of defendant Sharp Corporation. During the Relevant Period, Sharp
22  Electronics Corporation sold and distributed TFT-LCD Products manufactured by defendant Sharp
23  Corporation to customers throughout the United States and elsewhere.

24    48. Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes
25  referred to collectively herein as "Sharp."

26    **5.  Toshiba**

27    49. Defendant Toshiba Corporation is a Japanese company with its principal place of
28  business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. Toshiba Corporation also

11

1  participates in a joint venture that manufactures, sells, and distributes TFT-LCD Products – Toshiba

2  Mobile Display Co., Ltd. During the Relevant Period, Toshiba Corporation manufactured, sold, and

3  distributed TFT-LCD Products to customers throughout the United States and elsewhere.

4      50.    Defendant Toshiba America Electronic Components, Inc. is a California corporation

5  with its principal place of business at 19900 MacArthur Boulevard, Suite 400, Irvine, California.

6  Toshiba America Electronic Components, Inc. is a wholly-owned and controlled subsidiary of Toshiba

7  America, Inc., a holding company for defendant Toshiba Corporation. Toshiba America Electronic

8  Components, Inc. is the United States sales and marketing representative for Defendants Toshiba

9  Corporation and Toshiba Mobile Display Co., Ltd. During the Relevant Period, Toshiba America

10 Electronic Components, Inc. sold and distributed TFT-LCD Products manufactured by Toshiba

11 Corporation to customers throughout the United States and elsewhere.

12     51.    Defendant Toshiba America Information Systems, Inc. is a California corporation with

13 its principal place of business at 9740 Irvine Boulevard, Irvine, California. Toshiba America

14 Information Systems, Inc. is a wholly-owned and controlled subsidiary of Toshiba America, Inc.

15 During the Relevant Period, Toshiba America Information Systems, Inc. sold and distributed TFT-

16 LCD Products manufactured by Toshiba Corporation to customers throughout the United States and

17 elsewhere.

18     52.    Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc., and

19 Toshiba America Information Systems, Inc. are sometimes referred to collectively herein as "Toshiba."

20     53.    Defendant Toshiba Mobile Display Co., Ltd. ("Toshiba Mobile") is a Japanese

21 company with its principal place of business at 1-9-2, Hatara-cho, Fukaya-Shi, Saitama, 366-0032,

22 Japan. Toshiba Corporation owns 99.9% of the outstanding shares of Toshiba Mobile, and Toshiba

23 Hokuto Electronics Corporation owns 0.1% of the outstanding shares of Toshiba Mobile. Toshiba

24 Mobile was created for the purposes of manufacturing TFT-LCD Products. During the Relevant

25 Period, Toshiba Mobile manufactured, sold, and distributed TFT-LCD Products to customers

26 throughout the United States and elsewhere.

27

28

COMPLAINT

1    IV.    **AGENTS AND CO-CONSPIRATORS**

2        54.    The acts alleged against the Defendants in this Complaint were authorized, ordered, or

3    done by their officers, agents, employees, or representatives, while actively engaged in the

4    management and operation of Defendants' businesses or affairs.

5        55.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or

6    for, other Defendants or co-conspirators with respect to the acts, violations, and common course of

7    conduct alleged by Dell. Each United States Defendant that is a subsidiary of a foreign parent acts as

8    the United States agent for TFT-LCD Products made by its parent company.

9        56.    Various persons and/or firms not named as Defendants in this Complaint participated as

10   co-conspirators in the violations alleged herein and may have performed acts and made statements in

11   furtherance thereof.

12       57.    These co-conspirators are believed to include, without limitation, LG Display Co., Ltd.,

13   formerly known as LG Philips LCD Co., Ltd., LG Display America, Inc., formerly known as LG

14   Philips LCD America, Inc. (collectively "LG Display"); LG Electronics, Inc. and LG Electronics USA,

15   Inc. (collectively "LG Electronics"); Samsung Electronics Co., Ltd., Samsung Electronics America,

16   Inc. ("Samsung America"), Samsung Semiconductor, Inc., Samsung Electronics Company, Ltd. (and

17   collectively "Samsung"); AU Optronics Corporation, AU Optronics Corporation America ("AU

18   America") (and collectively, AU Optronics"); Chi Mei Corporation ("CMC"), Chi Mei

19   Optoelectronics Corporation ("CMO"), CMO Japan Co., Ltd. ("CMO Japan"), Chi Mei

20   Optoelectronics USA, Inc. ("CMO USA"), Nexgen Mediatech, Inc. ("Nexgen"), Nexgen Mediatech

21   USA, Inc. ("Nexgen USA") (and collectively, "Chi Mei"); Chunghwa Picture Tubes, Ltd., Tatung

22   Company of America, Inc. ("Tatung America") (and collectively, "Chunghwa"); Royal Philips

23   Electronics N.V., and Philips Electronics North America Corp., Ltd. (collectively "Royal Phillips").

24       58.    Co-conspirator LG Electronics, Inc. began mass production of TFT-LCD panels in

25   September 1995. Since then, LG Electronics, Inc. has held, and continues to hold, substantial

26   ownership interests in entities that participate in the TFT-LCD industry, including LG Display Co.,

27   Ltd.

28

13

59.     In July 1999, LG Electronics, Inc. entered into a joint venture agreement with Koninklijke Philips Electronics N.V., forming LG Philips LCD Co., Ltd.  From 1999 until July of 2004, when LG Philips LCD Co., Ltd. became a public company, LG Electronics, Inc. owned and controlled fifty (50) percent of the outstanding voting securities of LG Philips LCD Co., Ltd.

60.     LG Electronics, Inc. was and continues to be LG Display Co., Ltd.'s single largest shareholder, currently holding over thirty-seven (37) percent of its outstanding voting securities.

61.     During the Relevant Period, LG Electronics, Inc. identified LG Display America, Inc. in public lists of subsidiaries and noted that one of its subsidiaries held 100% of the outstanding voting securities of LG Display America, Inc.  Given that LG Display Co. Ltd. is actually the sole owner of LG Display America, Inc., LG Electronics, Inc.'s public statements demonstrate that LG Electronics, Inc. treated LG Display Co. Ltd. as its subsidiary and treated LG Display Co. Ltd.'s assets as its own.

62.     Upon information and belief, LG Electronics, Inc. exercised and continues to exercise substantial control over LG Display Co., Ltd. and LG Display America, Inc. by virtue of its significant financial holdings and through the adoption of a shareholder agreement that allows LG Electronics, Inc. to appoint members of LG Display Co., Ltd.'s Board of Directors and management team, including LG Display Co., Ltd.'s Chief Executive Officer.

63.     During the Relevant Period, LG Display Co., Ltd.'s Board of Directors has included LG Electronics, Inc. management, including Hee Gook Lee, LG Electronics, Inc.'s President and Chief Technology Officer, and Simon (Shin Ik) Kang, who was LG Electronics, Inc.'s President of Digital Display Product Business Division and later President of Home Entertainment Business Division.  LG Display Co., Ltd. also recruits and retains key personnel from LG Electronics, Inc.  For example, the Chief Financial Officer for LG Electronics, Inc. in 2006, Young Soo Kwon, has been President and Chief Executive Officer for LG Display Co., Ltd. since February 2007.

64.     LG Electronics, Inc. also exercises substantial control over LG Display Co., Ltd. as one of its largest customers, representing at least 16% of LG Display Co., Ltd.'s sales in 2006, 17% of its sales in 2007 and 21% of its sales in 2008.  Similarly, LG Electronics, Inc. and its affiliates are substantial suppliers to LG Display Co., Ltd., representing over 16% of LG Display Co., Ltd.'s purchases in 2006, 23% in 2007 and 27% in 2008.

COMPLAINT

65.     During the Relevant Period, Dell purchased TFT-LCD Products from LG Electronics, Inc. and LG Display Co., Ltd., and their subsidiaries. Even when Dell purchased completed TFT-LCD Products from LG Electronics, Inc., it negotiated the purchase price/component cost for TFT-LCD panels directly with LG Electronics, Inc.'s supplier – LG Display Co., Ltd.

66.     Upon information and belief, LG Electronics, Inc. has not sued LG Display Co., Ltd.

67.     When Dell refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that Dell is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and members of the family were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed TFT-LCD Products to purchasers, these subsidiaries played a significant role in the conspiracy because the conspirators wished to ensure that the prices for such products paid by purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

## V.     FACTUAL ALLEGATIONS UNDERLYING THE UNLAWFUL CONSPIRACY

### A.     TFT-LCD Technology

68.     The technology behind TFT-LCDs is not new. In the 1950s and 1960s, RCA Corp. researched whether liquid crystals could be the basis for a new, lightweight, low-power display technology. In the 1970s, after RCA Corp. discontinued its efforts, Japanese companies took the lead in commercializing liquid crystal technology. These efforts resulted in monochrome calculators and watches. By at least the early 1990s, liquid crystal technology was introduced in notebook computers and small, low-resolution televisions. In the mid-1990s, the technology advanced further with the development of TFT-LCDs.

15

1    69.    TFT-LCD panels have no independent utility, and have value only as components of

2    TFT-LCD Products, such as mobile wireless handsets, desktop computer monitors, notebook

3    computer displays, laptop displays, and televisions. The demand for TFT-LCD panels thus derives

4    directly from the demand for such products.

5    70.    The basic structure of a TFT-LCD panel is two glass substrates sandwiching a layer of

6    liquid crystal compound. Liquid crystals change orientation under an applied electric field and can

7    thereby block or pass light. One glass substrate has thin chemical films that act as transistors, and the

8    other glass substrate is coated with liquid pigments that act as color filters. When voltage is applied to

9    the transistors, the liquid crystal bends, causing light to pass through the filters to create red, green, or

10   blue pixels. Pixels are the smallest unit in a picture image, and the density of pixels in a display

11   determines the resolution.

12   71.    The term "active matrix" describes the ability to switch each pixel in a display

13   individually. Unlike older LCDs that have one transistor for each row and column of pixels, TFT-

14   LCDs have a transistor for each pixel. Thus, the term "active matrix LCD" is sometimes used

15   interchangeably with TFT-LCD. Active matrix displays are brighter and sharper than passive matrix

16   displays of the same size.

17   72.    The glass substrates used for TFT-LCD panels begin with a "motherglass," a sheet of

18   glass that is cut to make multiple panels. TFT-LCDs are manufactured in fabs that are equipped to

19   handle a particular size motherglass. Technological innovations over time have allowed manufacturers

20   to begin the manufacturing process with larger and larger size motherglass sheets. This, in turn, has

21   resulted in the ability to fabricate larger and/or more TFT-LCD panels. Each increase in motherglass

22   size is described as a generation. Third generation fabs in the 1998 to 1999 period typically utilized

23   550 millimeter ("mm") by 650 mm motherglass, while some eighth generation fabs utilize 2160 mm

24   by 2460 mm motherglass. The use of larger motherglass provides substantial cost savings to

25   manufacturers.

26   73.    TFT-LCDs are capable of producing the same image as cathode ray tubes ("CRTs"), but

27   in a much smaller package. TFT-LCDs also have lower energy requirements, are generally easier to

28   read, and do not flicker like CRTs. TFT-LCD panels of approximately 10 inches or less in diagonal

16

are considered "small" or "medium" displays. They are also referred to as "mobile displays." These displays are commonly used in cell phones, personal digital assistants, and cameras.

74. TFT-LCDs of 10 inches in diagonal and larger are considered "large-area displays." Large-area displays are most commonly used for desktop computer monitors, notebook computers, and televisions. The core products during most of the Relevant Period were displays for notebook computers and computer monitors. During much of the Relevant Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for notebook computers or computer monitors. Dell purchased TFT-LCD large-area displays for desktop computer monitors and notebook computers, and purchased other completed TFT-LCD Products including large-area displays, such as televisions, during the Relevant Period.

**B. Structure of the TFT-LCD Industry**

75. The TFT-LCD industry has several characteristics that facilitated a conspiracy to fix prices, including high market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1. Market Concentration**

76. The market for TFT-LCD Products is very large. A September 28, 2006 Reuters article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007."

77. Despite its enormous size, the TFT-LCD industry is highly concentrated, a factor that is conducive to the type of collusive activity alleged by Dell. In 2005, the top five suppliers – Samsung, LG Display, Sharp, AU Optronics, and Chi Mei – collectively shipped 90 percent of all TFT-LCD panels for television use. According to estimates in late 2006 from industry analyst iSuppli Corporation ("iSuppli"), LG Display had the greatest share of LCD television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics (16.8%), and

17

1  Sharp (13.9%). These companies were the five largest producers as measured by market share during
2  much of the Relevant Period.

3  **2.    Information Sharing**

4        78.    Because of common membership in trade associations, interrelated business
5  arrangements such as joint ventures, allegiances between companies in certain countries, and
6  relationships between the executives of certain companies, there were many opportunities for
7  Defendants and their co-conspirators to discuss and exchange competitively sensitive information.
8  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant
9  messages. Defendants and their co-conspirators took advantage of these opportunities to discuss, and
10  agree upon, their pricing for TFT-LCD Products as alleged below.

11        79.    Additionally, the TFT-LCD industry is analyzed by several market research firms.
12  Each of these firms offers, for a fee, monthly market data on pricing, supply, utilization of fabs, and
13  other key indicators of market activity. The capacity and pricing data reported by these firms comes
14  directly from manufacturers. Manufacturers typically report historical, current, and perhaps most
15  importantly, prospective information. Thus, Defendants and their co-conspirators had access to each
16  other's future plans for bringing capacity on line, capacity utilization, market share, pricing, and the
17  advent of new technology. Because there were very few companies that needed to be analyzed in
18  order to obtain this data, all competitors in the TFT-LCD market had ready and timely access to
19  reliable information about their competitors' pricing as well as future supply and capacity decisions.
20  By meeting together as herein below alleged as well as monitoring and analyzing this information over
21  time, participants in the conspiracy were able to signal their respective intent, verify that the
22  conspiracy was working, and identify any parties who might be deviating from the conspiracy.

23  **3.    Consolidation**

24        80.    The TFT-LCD industry experienced significant consolidation during the Relevant
25  Period, including: (a) the creation of AU Optronics in 2001 through the merger of Acer Display and
26  Unipac Electronics; (b) the creation of Toshiba Mobile in 2002; (c) Fujitsu, Ltd.'s transfer of its LCD
27  business to Sharp in 2005; and (d) AU Optronics' acquisition in 2006 of Quanta Display, which
28  resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

18

1

### 4.  Multiple Interrelated Business Relationships

2      81.    The industry is marked by a web of cross-licensing agreements, joint ventures, and
3  other cooperative arrangements that can facilitate collusion.  AU Optronics, for example, entered into
4  licensing arrangements with Sharp in 2005 and Samsung in 2006.  Chunghwa did likewise with Sharp
5  in December of 2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa,
6  HannStar and Hitachi.

7      82.    The industry has a close-knit nature whereby multiple business relationships between
8  supposed competitors blurred the lines of competition and provided ample opportunity to collude.
9  These business relationships also created a unity of interest among competitors so that the conspiracy
10  was easier to implement and enforce than if such interrelationships did not exist.

11

### 5.  High Costs of Entry Into the Industry

12      83.    There are significant manufacturing and technological barriers to entry into the TFT-
13  LCD industry.  Efficient fabs are large and costly.  TFT-LCD Products are also subject to
14  technological advances, so that firms within the industry must spend significant capital on research and
15  development.  DisplaySearch, a research firm in Austin, Texas that covers the TFT-LCD industry,
16  reported in September 2005 that the top TFT-LCD manufacturers collectively spend $30 million a day
17  on property, plant, and equipment.  A January 2006 DisplaySearch report noted that a typical seventh
18  generation fab can cost more than $3 billion.

19      84.    During the Relevant Period, the costs of the assembly components, both as a whole and
20  individually, have been generally declining, and, in some periods, declining at a substantial rate.  Later
21  in the conspiracy, approximately 70 percent of the cost of TFT-LCD panel production was attributable
22  to the cost of raw materials.  The combination of price discussions and manipulation of the output of
23  TFT-LCD Products allowed Defendants and their co-conspirators to keep prices above where they
24  would have been but for the conspiracy.

25

### 6.  The "Crystal Cycle"

26      85.    The TFT-LCD industry is subject to business cycles of supply and demand.  In the TFT-
27  LCD industry, this cycle is known as the "crystal cycle."  This cycle has been described as "boom and

28

19

1  bust" periods caused by alternating periods of oversupply and shortages, which create downward and
2  upward pressures on prices for TFT-LCD Products.

3     86.    One fact that can affect such oversupply is the perceived demand for such products and
4  whether manufacturers have adequately predicted such demand in determining how much capacity to
5  build and how many TFT-LCD Products to produce.

6     87.    Another factor is the entry of new competitors.  Typically, when a new competitor
7  enters a market, it brings incremental production online thereby adding supply, and prices drop until an
8  equilibrium is reached.  In the TFT-LCD industry, however, Defendants and their co-conspirators
9  conspired to rein in and discipline these new entrants until the new entrants were assimilated into the
10 conspiracy.  This had the effect of tempering price drops and preventing them from reaching a
11 competitive equilibrium.

12    88.    The conspiracy did not completely eliminate the effects of the crystal cycle in the TFT-
13 LCD industry.  There were periods when Defendants' and their co-conspirators' collusive practices
14 drove prices for TFT-LCD Products so high that demand began to fall to the point that manufacturers
15 lowered prices for short periods of time.  However, Defendants' and their co-conspirators' efforts to
16 stabilize prices were successful in moderating the effects of the crystal cycle, including the impact on
17 prices paid by purchasers or TFT-LCD Products.  To the extent that prices for TFT-LCD Products fell,
18 they fell from levels that had been set conspiratorially, rather than from levels set by free and open
19 competition.  Additionally, prices did not fall as low as they would have absent the conspiratorial
20 conduct.

21    **7.    Dominant Products**

22    89.    Notwithstanding that there may be different applications for TFT-LCDs, there was a
23 consistent and homogeneous way for Defendants and their co-conspirators to monitor, analyze,
24 discipline, and enforce their conspiracy.  This was done by looking at the predominant, or most
25 popular, size panels and the applications for those panels that represented the highest percentage of
26 sales.  This was also accomplished by looking at standardized statistics used in the industry, such as
27 the amount of glass produced and revenues per metric ton of glass.  By using these and other industry

28

COMPLAINT

1  analytics, Defendants and their co-conspirators could and did monitor, analyze, discipline, and enforce
2  their price-fixing conspiracy.

3       90.     For example, from the fourth quarter of 1999 through mid-2003, half or more of the
4  TFT-LCD monitor shipments were 15-inch monitors. From mid-2003 to early 2006, 17-inch monitors
5  were the predominant size. As for TFT-LCD televisions, from the fourth quarter of 1999 through the
6  fourth quarter of 2000, shipments were predominantly of 10-inch to 14-inch models. During 2001 and
7  much of 2002, sales of 13-inch to 15-inch models dominated. And in 2004 and 2005, the majority of
8  shipments were of 20-inch and 32-inch models.

9       **C.**    **Pre-Conspiracy Market**

10       91.     Until the mid-1990s, Japanese companies like Hitachi, Toshiba, and Sharp were
11  essentially the exclusive suppliers of TFT-LCD panels.

12       92.     In early 1995, the industry faced declining TFT-LCD panel prices, which industry
13  analysts attributed to advances in technology and improving efficiencies. One analyst in this period
14  noted that the "flat panel display industry is following the classic cyclical business pattern of the
15  semiconductor industry." The Japanese manufacturers realized that the capacity growth from investing
16  in new plants was weakening the price of TFT-LCDs, and they slowed the rate of their investments.
17  This, however, provided an opening to Korean manufacturers.

18       93.     In 1995, three Korean companies – Samsung, LG Electronics, Inc. and, to a lesser
19  extent, Hyundai – entered the market. These Korean firms offered comparable products at reduced
20  prices in an effort to quickly gain market share. This resulted in increased competition in 1995, which
21  contributed to the significant price declines seen during that timeframe.

22       94.     Increases in manufacturing capacity and decreases in manufacturing costs seemed to
23  assure continuing price declines. By mid-1995, the Japanese companies and the new Korean
24  competitors had a total capacity to supply 14 million TFT-LCD panels, while demand for them was
25  only about three million. In addition to the surges in capacity during 1995, costs were also dropping as
26  production volume increased and manufacturing methods improved.

27
28

COMPLAINT

1    95.    By late 1995, the effect of the entry by Korean suppliers had pushed down the price of
2  some TFT-LCD panels by 50 percent from the previous year.  The origin of the TFT-LCD conspiracy
3  may be traceable to this trough in prices.

4    **D.    Defendants' and Co-Conspirators' Illegal Agreements**

5    96.    Beginning at a date as yet unknown to Dell, but at least as early as January 1, 1996 and
6  continuing thereafter up to and including December 11, 2006 at a minimum, Defendants and their co-
7  conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the
8  prices at which TFT-LCD Products have been sold throughout the world and the United States,
9  including directly and indirectly to Dell.

10    97.    Defendants, through their officers, directors and employees, effectuated a price-fixing
11  conspiracy between themselves and their co-conspirators by, among other things:

12    a.    Participating in meetings and conversations to discuss the prices and supply of TFT-LCD
13  Products in the global market, including the United States;

14    b.    Agreeing to fix the prices and limit the supply of TFT-LCD Products sold in the
15  global market, including the United States, in a manner that deprived Dell of free and open
16  competition as a direct and indirect purchaser;

17    c.    Issuing price announcements and quotations in accordance with the agreements
18  reached; and

19    d.    Selling TFT-LCD Products directly and indirectly to Dell, including in the United
20  States, at fixed, non-competitive prices.

21    98.    The TFT-LCD price-fixing conspiracy was effectuated through a combination of group
22  and bilateral discussions.  In the formative years, when the Japanese manufacturers first entered into
23  the price-fixing conspiracy, bilateral discussions were the primary method of communication.  During
24  this period of the conspiracy, Hitachi, Sharp, and Toshiba met or talked to, at least one other Defendant
25  or co-conspirator, about the prices for TFT-LCD Products, and thereby created a model for how the
26  conspiracy would be carried out after the Korean, and later the Taiwanese suppliers joined the
27  conspiracy to fix prices.  These meetings amongst Defendants Hitachi, Sharp, and Toshiba included
28  discussions about prices and output, including capacity utilization.  During these discussions, Hitachi,

22

1  Sharp, and Toshiba also shared proprietary and confidential information for no legitimate or pro-
2  competitive business reason. As more manufacturers entered the conspiracy, however, group meetings
3  became more prevalent. By 2001, a formal system of multilateral meetings was in place.

### 1. "Crystal Meetings"

5  99. The group meetings among the participants in the TFT-LCD price-fixing conspiracy
6  were referred to as "crystal meetings." Crystal meetings were attended by employees at three general
7  levels of Defendants' or conspirators' corporations. The first level of these meetings was attended by
8  the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings. The second
9  level was management-level meetings, referred to as "commercial" or "operation" meetings. The third
10  level was meetings attended by sales and marketing personnel.

11  100. In a typical crystal meeting, the participants established a meeting agenda that included
12  a discussion of the past month's producer shipments, customer demand, capacity utilization, and
13  prices. Meeting participants shared information relating to all of these topics so that the conspirators
14  could agree on what price each would charge for TFT-LCD panels to be sold in the following month.
15  Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for TFT-
16  LCD panels. They also discussed prices of TFT-LCD panels that were sold to specific customers,
17  including Dell, and agreed upon target prices to be used in negotiations with large customers.

18  101. Each of the participants in these meetings knew, and in fact discussed, the significant
19  impact that the price of TFT-LCD panels has on the cost of the finished products into which they are
20  placed. Conspirators knew that the conspiratorially high prices of TFT-LCD panels would be reflected
21  in the prices for finished TFT-LCD Products, and thus, there was no need to specifically discuss the
22  prices of finished TFT-LCD Products.

23  102. The purpose of the CEO meetings was to stabilize or raise prices. The CEO meetings
24  occurred quarterly from approximately 2001 to 2006. At the CEO meetings, the participants discussed
25  prices and the supply and demand situation. The participants also discussed monthly and quarterly
26  TFT-LCD fab output and supply figures, as well as the number of production days the fabs would
27  operate for the next month, and agreed on output restrictions. Each meeting had an individual
28  designated as the "chairman" who would use a projector or a whiteboard to put up figures on supply

23

1   and demand and price for the group to review. The attendees would take turns making comments and
2   adjusting the numbers. At some point during the meeting, the participants would reach an agreement
3   on price.

4       103.    The commercial or operation meetings were attended by the Defendants' and their
5   conspirators' respective Vice Presidents of sales and marketing and other senior sales employees. The
6   structure and content of the commercial meetings was largely the same as the CEO meetings. The
7   participants discussed price, output, capacity, and the general market situation. These meetings
8   occurred approximately monthly and sometimes quarterly.

9       104.    The agreements reached at these meetings included: (1) establishing target prices, floor
10  prices, and price ranges; (2) placing agreed-upon values on various attributes of panels, such as quality
11  or certain technical specifications; (3) what to tell customers as the reason for price increases; (4)
12  coordinating uniform public statements regarding anticipated supply and demand; (5) exchanging
13  information about fabrication plant utilization and production capacity; and (6) reaching out to other
14  competitors to encourage them to abide by the agreed-upon pricing. The meeting participants also
15  agreed to maintain or lower production capacity and confirmed prices actually charged to help monitor
16  the conspiracy.

17      105.    During these CEO and commercial meetings, the Defendants and their co-conspirators
18  also agreed to conceal the fact and substance of the meetings, and, in fact, took various steps to do so.
19  Top executives and other officials attending these meetings were instructed on more than one occasion
20  not to disclose the fact of these meetings to outsiders, or even to other employees of the Defendants or
21  co-conspirators not involved in TFT-LCD Product pricing or production. On at least one occasion, top
22  executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they
23  would not be seen in the company of each other coming or going to such meeting.

24      106.    Compared to the CEO and commercial meetings, the sales and marketing personnel
25  meetings were less formal, and typically occurred at restaurants over lunch. The purpose of these
26  meetings was to exchange market information that would facilitate implementation of the conspiracy
27  and carry out the agreements made at the CEO and commercial meetings. Participants in the sales and

28

24

1 | marketing personnel meetings exchanged information relating to past and future prices of TFT-LCD
2 | Products and shipment quantities.

3 | 107. In the summer of 2006, sales and marketing personnel meetings were discontinued in
4 | favor of coordinated one-on-one meetings. The meetings were coordinated so that on the same date,
5 | two sets of competitors met one-on-one. After that meeting, each of them met one-on-one with
6 | another competitor. This continued until all competitors met with each other. These coordinated
7 | meetings took place until about November or December 2006. It was Defendants' and their co-
8 | conspirators' specific intent to conceal their meetings and for these coordinated one-on-one meetings
9 | to accomplish the same purposes as the group meetings.

10 | **2. Bilateral Discussions**

11 | 108. The crystal meetings were reinforced by bilateral discussions between various
12 | Defendants and co-conspirators. The purpose of the bilateral discussions was to exchange information
13 | about past and future pricing, as well as information about shipments. Certain Defendants or co-
14 | conspirators were assigned other Defendants or co-conspirators not in attendance and agreed to and did
15 | in fact communicate with non-attending Defendants or co-conspirators to synchronize the price and
16 | production limitations agreed to at the crystal meetings (described above). Participants at the crystal
17 | meetings contacted Japanese Defendants (such as Sharp, Hitachi and Toshiba) to relay the agreed-upon
18 | pricing and production limitations.

19 | 109. Defendants and their co-conspirators had bilateral discussions with each other during
20 | price negotiations with customers to avoid being persuaded by customers to cut prices. These
21 | discussions, usually between sales and marketing employees, took the form of in-person meetings,
22 | telephone calls, e-mails, and instant messages. The information gained in these communications was
23 | then shared with supervisors and taken into account in determining the price to be offered.

24 | 110. The crystal meetings were also supplemented by additional bilateral discussions between
25 | various Defendants and their co-conspirators in which they exchanged information about pricing,
26 | shipments, and production. As is more fully alleged below, Defendants and their co-conspirators
27 | had bilateral discussions with one another during price negotiations with customers in order to
28 | avoid cutting prices and to implement the fixed prices set by Defendants and their co-conspirators

25

1  during the crystal meetings. These discussions usually took place between sales and marketing

2  employees in the form of telephone calls, emails and instant messages. The information gained in these

3  communications was then shared with supervisors and taken into account in determining the price to

4  be offered to the Defendants' or conspirators' customers.  Bilateral discussions were also used to

5  synchronize prices with manufacturers that did not ordinarily attend the group meetings.  For

6  example, HannStar was responsible for notifying Hitachi of the pricing agreements reached at the

7  crystal meetings.  Hitachi implemented the agreed-upon pricing as conveyed by HannStar.  In this

8  way, Hitachi participated in the conspiracy to fix the prices of TFT-LCD Products.

9  **3.  Defendants' and Co-Conspirators' Participation in Group and Bilateral**

10  **Discussions**

11  111.  Defendant Epson Imaging Devices Corporation participated in multiple CEO,

12  commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006.

13  Through these discussions, Epson Imaging Devices Corporation agreed on prices and supply levels for

14  TFT-LCD Products.  Epson Imaging Devices Corporations has already pled guilty in this Court for

15  fixing the prices of TFT-LCD Products.

16  112.  Defendant Epson America is a wholly-owned and controlled subsidiary of Defendant

17  Epson Imaging Devices Corporation.  Epson Imaging Devices Corporation and Epson America,

18  through their agent, were parties to the agreements made at the above-described CEO, commercial, and

19  lower level meetings, as well as bilateral discussions, and acted as co-conspirators.  In addition, to the

20  extent Epson America distributed TFT-LCD Products to direct purchasers, it played a significant role

21  in the conspiracy because Defendants and their co-conspirators wished to ensure that the prices for

22  such products paid by direct purchasers did not undercut the pricing agreements reached at these

23  various meetings.  Epson America was an active, knowing participant in the conspiracy.

24  113.  Defendant HannStar participated in multiple CEO, commercial, and lower level

25  meetings, as well as bilateral discussions, between at least 2001 and 2006.  Through these discussions,

26  HannStar agreed on prices and supply levels for TFT-LCD Products.  On information and belief,

27  HannStar is currently under investigation by the DOJ for fixing the prices of TFT-LCD Products and

28

26

1  HannStar has announced the existence of the DOJ's and other foreign enforcers' investigations in
2  public filings.

3       114.    Defendant Hitachi had multiple bilateral discussions during the Relevant Period, and
4  agreed on prices and supply levels for TFT-LCD Products. Hitachi has already pled guilty in this
5  Court for fixing the prices of TFT-LCD Products, specifically including those TFT-LCD Products sold
6  to Dell, and one of its executives has been indicted for the same.

7       115.    Defendant Sharp participated in multiple group and bilateral meetings during the
8  Relevant Period, and agreed on prices and supply levels for TFT-LCD Products. Sharp has already
9  pled guilty in this Court for fixing the prices of TFT-LCD Products, specifically including those TFT-
10 LCD Products sold to Dell.

11      116.    Defendant Toshiba participated in bilateral discussions during the Relevant Period, and
12 agreed on prices and supply levels for TFT-LCD Products. Toshiba has announced that it is under
13 investigation by the DOJ and other foreign enforcers for fixing the prices of TFT-LCD Products.

14      117.    Defendant Toshiba Mobile is a joint venture with Toshiba Corporation as one of its
15 partners, and one or more of the partners in this joint venture participated in the meetings described
16 above. As a result, Toshiba Mobile was represented at those meetings by its agents and was a party to
17 the agreements entered into by its joint venture partners at them. As explained above, the agreements
18 at these meetings included agreements on price ranges and output restrictions. The joint venture
19 partners controlled Toshiba Mobile's production levels and the prices of TFT-LCD Products the joint
20 venture sold both to the joint venture partners and other non-affiliated companies. Thus, Toshiba
21 Mobile was an active, knowing participant in the alleged conspiracy.

22      118.    AU Optronics participated in multiple CEO, commercial, and lower level meetings, as
23 well as bilateral discussions, between at least 2001 and 2006. Additionally, Quanta Display Inc. and
24 Unipac Electronics, which merged with AU Optronics, participated in lower level meetings. Through
25 these discussions, AU Optronics agreed on prices and supply levels for TFT-LCD Products. AU
26 Optronics has announced that it is under investigation by the DOJ and other foreign enforcers for
27 fixing the prices of TFT-LCD Products and indeed made a reserve to satisfy expected fines that will be
28 forthcoming.

27

119.     Chi Mei participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chi Mei agreed on prices and supply levels for TFT-LCD Products. Chi Mei Optoelectronics Corporation has already pled guilty in this Court for fixing the prices of TFT-LCD Products.

120.     Chunghwa participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Chunghwa agreed on prices and supply levels for TFT-LCD Products. Chunghwa, and three of its executives, have already pled guilty in this Court for fixing the prices of TFT-LCD Products, and two other of its executives have been indicted for the same.

121.     LG Display participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, LG Display agreed on prices and supply levels for TFT-LCD Products. LG, and two of its executives, have already pled guilty in this Court for fixing the prices of TFT-LCD Products, and another one of its executives has been indicted for the same.

122.     Samsung participated in multiple CEO, commercial, and lower level meetings, as well as bilateral discussions, between at least 2001 and 2006. Through these discussions, Samsung agreed on prices and supply levels for TFT-LCD Products. On information and belief, Samsung is the amnesty applicant to the DOJ for its investigation into price fixing of TFT-LCD Products and has been granted conditional leniency in exchange for providing evidence of its price fixing of TFT-LCD Products.

123.     In their March 30, 2009 Answer to Second Amended Direct Purchaser Plaintiffs' Consolidated Complaint, pending in *In Re TFT-LCD (Flat Panel) Antitrust Litigation*, M:07-1827-SI in this Court, co-conspirators LG Display Co., Ltd. and LG Display America, Inc. admit that:

   a.     certain of their employees participated in meetings referred to as "crystal meetings" (Par. 107);

   b.     that various types of crystal meetings were ongoing during 2004 (Par. 181);

   c.     that participants at crystal meetings discussed price, output, capacity, and the general market situation (Par. 111); and

28

1      d.      participants in the lower level meetings exchanged information relating to past and
2  future prices of TFT-LCD Products and shipment quantities (Par. 113).

3      **E.**    **International Government Antitrust Investigations**

4      124.    The conspiracy to restrict artificially the output of, and to raise the prices for, TFT-LCD
5  Products during the Relevant Period, came to light in late 2006 as a result of a multinational
6  investigation commenced by the DOJ and others.

7      125.    In December of 2006, government authorities in Japan, South Korea, the European
8  Union, and the United States revealed the existence of a comprehensive investigation into anti-
9  competitive activity among TFT-LCD manufacturers. In a December 11, 2006 filing with the
10 Securities and Exchange Commission, defendant LG Display disclosed that officials from the South
11 Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul
12 and Tokyo offices and that the DOJ had issued a subpoena to its San Jose office.

13     126.    On December 12, 2006, news reports indicated that in addition to LG Display,
14 Samsung, Sharp, and AU Optronics were also under investigation. The Japanese Fair Trade
15 Commission stated that the probe was related to price-fixing. On that same date, the European
16 Commission confirmed publicly that it as well was investigating the possibility of a cartel agreement
17 and price-fixing among manufacturers of TFT-LCD Products.

18     127.    Defendants and co-conspirators, including Toshiba, Samsung, Chi Mei, and AU
19 Optronics, also revealed criminal investigations of themselves or the TFT-LCD industry in their 2007
20 and/or 2008 annual reports.

21     128.    In its Form 6-K Yearly Report filed with the Securities and Exchange Commission on
22 March 31, 2009, LG Display Co., Ltd. stated that "[a]s of December 31, 2008, [LG Display] is under
23 investigations by fair trade or antitrust authorities in Korea, Japan, Canada and European Commission
24 with respect to possible anti-competitive activities in the LCD industry as of December 31, 2008."

25     129.    On December 18, 2008, the Japanese Fair Trade Commission announced that it had
26 investigated TFT-LCD modules used for display screens of hand-held gaming devices and determined
27 that Hitachi and Sharp violated Japan's Antimonopoly Act by exchanging pricing information in
28 September and November 2006, and agreeing about the price of TFT-LCD modules for use in hand-

29

1  held game consoles. The Commission ordered Hitachi and Sharp to cease and desist their violations of

2  Japan's Antimonopoly Act and fined Sharp 251 million yen (approximately $2.9 million). Sharp

3  requested a hearing on the fine and in March, 2009, the Commission decided to commence hearing

4  procedures.

5      130.    In its 2008 annual report, AU Optronics revealed that in January 2009, the Taiwanese

6  Fair Trade Commission visited AU Optronics' offices in Taiwan and requested information pursuant to

7  its investigation into price fixing in the TFT-LCD industry.

8          **F.    United States' Criminal Actions**

9      131.    Numerous Defendants and their co-conspirators have pled guilty to price fixing TFT-

10  LCD Products, including a number of Defendants and co-conspirators who have specifically pled

11  guilty to price fixing TFT-LCD Products sold to Dell during the Relevant Period.

12     132.    On November 12, 2008, the DOJ announced that it had reached agreements with three

13  TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S. subsidiary, LG Display America Inc.),

14  Sharp Corporation, and Chunghwa Picture Tubes, Ltd. – to plead guilty and pay a total of $585 million

15  in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD Products.

16     133.    LG Display Co. Ltd. and LG Display America Inc. agreed to plead guilty and pay a

17  $400 million fine for their participation in a conspiracy from September 2001 to June 2006 to fix the

18  price of TFT-LCD Products sold in the United States. Chunghwa Picture Tubes, Ltd. agreed to plead

19  guilty and pay a $65 million fine for its participation in a conspiracy from September 2001 to

20  December 2006 to fix the price of TFT-LCD Products sold in the United States. The DOJ charged LG

21  Display Co., Ltd., LG Display America Inc., and Chunghwa Picture Tubes, Ltd. with carrying out the

22  conspiracy by:

23      a.      participating in meetings, conversations, and communications in Taiwan, Korea and the

24  United States to discuss the prices of TFT-LCD Products;

25      b.      agreeing during those meetings, conversations and communications to charge prices for

26  TFT-LCD Products at certain predetermined levels;

27      c.      issuing price quotations in accordance with the agreements reached; and

28

30

d.    exchanging information on sales of TFT-LCD Products, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

134.   During the December 15, 2008 sentencing hearing for LG Display Co. Ltd. and LG Display America Inc., DOJ lawyers explained that LG Display Co. Ltd. and LG Display America Inc. agreed that the TFT-LCD conspiracy affected a volume of commerce of $2.5 billion, and that amount included purchases of TFT-LCD products from LG Display Co. Ltd. and LG Display America Inc., by companies including Dell, even where those companies had foreign offices involved in procurement. The DOJ also noted that its calculation of commerce affected "in no way limits the civil plaintiffs and what their claims are in damages. And [the DOJ] expect[s] that their claims will be…even broader than this."

135.   Sharp Corporation agreed to pay a $120 million fine for its participation in conspiracies to fix the price of TFT-LCD Products sold to Dell from April 2001 to December 2006 for use in computer monitors and laptops; to Motorola, Inc. from autumn 2005 to the middle of 2006 for use in Razr mobile phones; and to Apple Computer, Inc. from September 2005 to December 2006 for use in iPod portable music players.

136.   Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD Products sold to Dell between 2001 and 2006 by:

a.    participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD Products to be sold to Dell;

b.    agreeing during those bilateral meetings, conversations and communications to charge prices of TFT-LCD Products at certain predetermined levels to Dell;

c.    issuing price quotations in accordance with the agreements reached; and

d.    exchanging information on sales of TFT-LCD Products to be sold to Dell for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

137.   Sharp Corporation agreed to plead guilty to fixing the price of TFT-LCD Products sold to Motorola and Apple between 2005 and 2006 by:

a.    participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD Products to be sold to Apple and Motorola;

31

1        b.     agreeing during those bilateral meetings, conversations and communications to charge

2    prices of TFT-LCD Products at certain predetermined levels to Apple and Motorola;

3        c.     issuing price quotations in accordance with the agreements reached; and

4        d.     exchanging information on sales of TFT-LCD Products to be sold to Apple and

5    Motorola, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

6        138.    On January 15, 2009, the DOJ announced it reached additional agreements with four

7    executives of LG Display Co. Ltd. and Chunghwa Picture Tubes Ltd., who all agreed to plead guilty

8    and serve jail time in the United States for participating in the TFT-LCD conspiracy. The four

9    individuals are Chang Suk "C.S." Chung (with LG Display), and Chieng-Hon "Frank" Lin, Chih-Chun

10   "C.C." Liu and Hsueh-Lung "Brian" Lee (all with Chunghwa). All four of these individuals have now

11   plead guilty and been sentenced, and at their sentencing hearings, confirmed the allegations against

12   them that they participated in the global TFT-LCD conspiracy.

13       139.    On February 3, 2009, the DOJ announced that three additional executives were indicted

14   for participating in the TFT-LCD conspiracy. These three executives are Cheng Yuan "C.Y." Lin and

15   Wen Jun "Tony" Cheng (both with Chunghwa), and Duk Mo Koo (with LG Display).

16       140.    Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating, at various

17   times, in the conspiracy to fix the price of TFT-LCD Products sold worldwide from September 2001

18   through December 2006. Specifically, Mr. Lin and Mr. Cheng have been charged with participating in

19   meetings, conversations and communications in Taiwan, South Korea and the United States to discuss

20   the prices of TFT-LCD Products, including the crystal meetings that took place in Taiwan. Mr. Lin

21   and Mr. Cheng have also been charged with agreeing to fix the prices of TFT-LCD Products at

22   certain predetermined levels, issuing price quotations in accordance with the agreements reached,

23   exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to

24   the agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate

25   employees in the conspiracy, accepting payment for the supply of TFT-LCD Products sold at

26   collusive, noncompetitive prices to customers in the United States, and taking steps to conceal the

27   conspiracy and their conspiratorial contacts.

28       141.    Duk Mo Koo, former Executive Vice President and Chief Sales Officer from LG

COMPLAINT

1 | Display, has been indicted for participating in the conspiracy to fix the prices of TFT-LCD Products
2 | sold worldwide, including the United States and California in particular, from December 2001
3 | through December 2005. Specifically, Mr. Koo has been charged with participating in meetings,
4 | conversations and communications in Taiwan, South Korea and the United States to discuss the
5 | prices of TFT-LCD Products, including the crystal meetings that took place in Taiwan. Mr. Koo
6 | has also been charged with agreeing to fix the prices of TFT-LCD Products at certain
7 | predetermined levels, issuing price quotations in accordance with the agreements reached,
8 | exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the
9 | agreed-upon prices, authorizing, ordering, and consenting to the participation of subordinate employees
10 | in the conspiracy, accepting payment for the supply of TFT-LCD Products sold at collusive,
11 | noncompetitive prices to customers in the United States, and taking steps to conceal the conspiracy
12 | and his conspiratorial contacts.

13 | 142. On March 10, 2009, the DOJ announced it reached an additional agreement with
14 | Hitachi Displays Ltd. to plead guilty and pay a $31 million fine. As with Sharp, Hitachi Displays Ltd.
15 | pled to fixing prices to Dell, specifically for fixing prices on TFT-LCD Products for use in notebook
16 | computers that were sold to Dell Inc. or its subsidiaries.

17 | 143. Hitachi Displays Ltd. agreed to plead guilty to fixing the price of TFT-LCD Products
18 | sold to Dell between April 1, 2001 and March 31, 2004 by:

19 | a. participating in meetings, conversations and communications in Japan, Korea and the
20 | United States to discuss the prices of TFT-LCD Products to be sold to Dell;

21 | b. agreeing, during those meetings, conversations and communications, to charge prices of
22 | TFT-LCD Products to be sold to Dell at certain predetermined levels;

23 | c. issuing price quotations in accordance with the agreements reached; and

24 | d. exchanging information on sales of TFT-LCD Products sold to Dell, for the purpose of
25 | monitoring and enforcing adherence to the agreed-upon prices.

26 | 144. On March 31, 2009, the DOJ announced that Sakae Someya, a Senior Manager for
27 | Sales & Marketing at Hitachi Displays Ltd., was indicted for participating in the TFT-LCD conspiracy.

28 |

33

1 As with Hitachi Displays Ltd., the conspiracy alleged against Someya includes specifically fixing the
2 prices of TFT-LCD Products purchased by Dell and its subsidiaries.

3     145. On April 27, 2009, the DOJ announced that Bock Kwon, an executive from LG
4 Display Co. Ltd. who held titles such as Vice President of Notebook Sales, Vice President of Sales
5 Planning, and Executive Vice President of Sales and Marketing, agreed to plead guilty to participating
6 in the conspiracy to fix the prices of TFT-LCD Products sold worldwide, including the United States
7 and California in particular, from September 2001 through June 2006. Specifically, Mr. Kwon
8 admitted that he participated in meetings, conversations and communications in Taiwan, South Korea
9 and the United States to discuss the prices of TFT-LCD Products, agreed to fix the prices of TFT-
10 LCD Products at certain predetermined levels, issued price quotations in accordance with the
11 agreements reached, exchanged pricing and sales information for the purpose of monitoring and
12 enforcing adherence to the agreed-upon prices, and authorized, ordered, and consented to the
13 participation of subordinate employees in the conspiracy. In connection with his guilty plea, Mr.
14 Kwon agreed to serve a 12-month prison term and pay a criminal fine of $30,000.

15     146. On August 25, 2009, the DOJ announced it reached an agreement with Epson Imaging
16 Device Corporation to plead guilty and pay a $26 million fine for its roles in the conspiracy to fix
17 prices of TFT-LCD Products.

18     147. Defendant Epson Imaging Devices Corporation agreed to plead guilty to fixing the price
19 of TFT-LCD Products sold to Motorola, Inc. from 2005 through 2006 by:

20     a. participating in meetings, conversations and communications in Japan and the United
21 States to discuss the prices of TFT-LCD Products;

22     b. agreeing, during those meetings, conversations and communications, to charge prices of
23 TFT-LCD Products at certain predetermined levels;

24     c. issuing price quotations in accordance with the agreements reached; and

25     d. exchanging information on sales of TFT-LCD Products sold for the purpose of
26 monitoring and enforcing adherence to the agreed-upon prices.

27

28

34

COMPLAINT

148.    On December 9, 2009, the DOJ announced it reached an agreement with Chi Mei Optoelectronics to plead guilty and pay a $220 million fine for its roles in the conspiracy to fix prices of TFT-LCD Products.

149.    Defendant Chi Mei Optoelectronics plead guilty on February 8, 2010 to fixing the price of TFT-LCD Products from September 14, 2001 to December 1, 2006 by:

a.      participating in meetings, conversations and communications in Japan and the United States to discuss the prices of TFT-LCD Products;

b.      agreeing, during those meetings, conversations and communications, to charge prices of TFT-LCD Products at certain predetermined levels;

c.      issuing price quotations in accordance with the agreements reached; and

d.      exchanging information on sales of TFT-LCD Products sold for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

150.    Therefore, to date, at least six corporate Defendants or co-conspirators and nine individuals have been charged in the DOJ's antitrust investigation into the TFT-LCD industry.  To date, more than $860 million in criminal fines have been imposed, or agreed to, and five individuals have pleaded guilty and have been sentenced to serve jail time.

151.    Other co-conspirators anticipate being indicted in coming months.  For example, during the fourth quarter of 2009, AUO's financial statements included a special reserve of approximately NT$10 Billion (US$312 million) for the LCD price-fixing lawsuits.  During the Fourth Quarter 2009 Results Investor Conference, AUO represented that "[t]he company expects that indictments against the company and certain personnel may be forthcoming in the next few months. . . ."

152.    According to the DOJ, its investigation is still ongoing.

153.    These guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities but demonstrate substantial violations of antitrust laws, with Dell as the targeted victim.

## G.      Market During the Price-Fixing Conspiracy

154.    After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  However, since at least

35

1   1996, the TFT-LCD Products market has been characterized by unnatural and sustained price stability,
2   as well as certain periods of substantial increases in prices.  Defendants and their co-conspirators
3   achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply
4   through decreases in capacity utilization and restraint in new plant investment.

5          155.   As described herein, Defendants' and their co-conspirators' TFT-LCD cartel evolved
6   over time.  Defendants and their co-conspirators initiated their cartel when TFT-LCD Products were in
7   their relative infancy.  At that time, the conspirators balanced the desire to set prices collusively with
8   the industry goal of establishing their products in the marketplace.  As the cartel matured, new entrants
9   were co-opted, and production costs declined.  At the same time, conspirators learned how they could
10  best mitigate the crystal cycle by agreeing on prices and output.

11         **1.     1996**

12         156.   By early 1996, analysts were lamenting the excess supply and drastic price cuts in the
13  TFT-LCD markets.  The downward pressure on prices, which had already fallen 40 to 50 percent in
14  1995, was projected to continue due to lower manufacturing costs.  Despite this, TFT-LCD Product
15  prices actually rose in 1996, allegedly due to insufficient production capacity.  In reality, Defendants
16  and their co-conspirators were fixing the prices.

17         157.   During this period, the Japanese companies herein began to partner with Taiwanese
18  companies to trade technology and collaborate on supply.  Japanese engineers were lent to Taiwanese
19  firms, and Taiwanese output was shipped to Japan.  This mutually beneficial relationship between
20  purported competitors continued into at least 1999.

21         158.   A few months into 1996, there was a reversal in the downward trend in TFT-LCD
22  Product prices and an alleged inability of manufacturers to supply enough TFT-LCD panels to meet
23  demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers
24  are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . .
25  . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors
26  are constantly being surprised by the sudden twists and turns."

27         159.   By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD panel
28  prices that was noted to be "quite rare in the electronics industry."

COMPLAINT

160.     The "rare" increase in TFT-LCD panel prices was due to the agreements reached by the Japanese companies to increase prices. These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

161.     1996 also brought the advent of third generation fabs. In order to stay current with technology, manufacturers were moving quickly into third generation motherglass. LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier. This resulted in surging prices. These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

**2.     1997 - 1998**

162.     By 1997, Japanese manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology. In return, the Japanese received output from Taiwanese plants. In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005. These arrangements between Japanese and Taiwanese companies resulted in cooperative discussions between supposed competitors. It was also expected to contribute to an increase in supply of TFT-LCD panels.

163.     By 1998, the TFT-LCD industry still had excess capacity, due in part to the still recent entry of the Korean companies. A March 30, 1998 article in Electronic News reported that Hyundai's production lines were running at only 20 to 50 percent of capacity. The article quoted Rob Harrison, director of marketing for Hyundai's display division, as saying, "There is plenty of inventory and capacity available to suit any shortage . . . . You have to get your production up to full capacity again before you can even talk about there being a shortage and I think there are plenty of under-capacity fabs right now to bear the burden."

164.     During this period, Samsung made a concerted effort to get other manufacturers in the industry to limit production. Yoon-Woo Lee, President and CEO of the Semiconductor Division of Samsung Electronics Co., Ltd. gave the keynote address at the Eighteenth International Display Research Conference (known as Asia Display 98). Mr. Lee said:

37

In order to maintain the tradition of top CRT manufacturer, we need to capture the high end market [and] deviate from the volume production of CRTs and LCDs. Taiwan is trying to enter TFT-LCD business because it has the advantage of the large PC production. To survive in this rapidly changing environment, we have to revise our previous strategies and redirect our business plans. It is time for fundamental shift for future decisions, time for transformation from volume driven to cost driven, time for driving value added strategies. If we prepare now by shifting from the traditional business approach, to value added new approach, we may be able to deviate from repeating the "crystal cycle" again.

165.   Samsung's effort to limit production, capacity restraints and the price-fixing agreement caused decreases in prices of TFT-LCD Products to slow and stop in late 1998.

**3.   1999**

166.   The efforts commenced by Samsung in 1998 continued to bear fruit. In 1999, TFT-LCD Product prices surged during that year due to a claimed "massive undersupply." This was despite the entry of Taiwanese manufacturers and several new fabs coming online.

167.   At the beginning of 1999, industry publications suggested that the Japanese and Korean manufacturers were going to have the opportunity to recoup previous years' losses: "The AM-LCD imbalance has triggered cash-strapped Japanese and Korean vendors to up their tags in an effort to wash away the stain left by years of red ink . . . ."

168.   By mid-1999, a Korean source was reporting: "[w]ith the supply shortage for TFT-LCD panels unlikely to be corrected in the near future, the domestic LCD industry is gleefully increasing its sales targets amid a sharp price rise." The lack of supply was a pretextual reason given publicly to justify a price increase.

169.   Significantly, Bock Kwon (high-ranking executive with LG Display who pled guilty in the United States for his role in the global conspiracy to fix prices in the sale of TFT-LCD Products) and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, announced the following in the same trade publication:

LG LCD will raise prices across its entire TFT-LCD portfolio by 30 to 40 percent this year, Kwon said, although he expects that prices will stabilize some time in the second half.

38

According to Samsung, demand for larger panels is reducing capacity because each display is eating up more square inches per motherglass substrate.  This, combined with a stagnation in capital spending by many panel makers, will keep the LCD industry in a period of relative shortage until 2001, Lee said.  The shortage has become acute, and has created an unusual market in which prices could rise as much as 30% to 80% in one year according to Ross Young, President of DisplaySearch, a research firm in Austin, Texas.

170.    Also in 1999, the three major TFT-LCD producers in Korea became two, when LG Electronics, Inc. merged with Hyundai and, LG Electronics, Inc. and Koninklijke Philips Electronics N.V. created LG Display.

**4.    2000 - 2001**

171.    By January of 2000, prices for TFT-LCD Products were falling again.  The price decline in this period was substantially influenced by the entry of six new Taiwanese competitors, including Chi Mei, Chunghwa, HannStar, and Acer Display Technology, Inc. (later part of AU Optronics).  Taiwanese suppliers began their entry into the market in late 1999 and early 2000, by undercutting the collusively high prices of the other suppliers to gain immediate market share.  However, by 2000-2001, the Taiwanese suppliers had increased their market share to the point that it made sense to participate in the conspiracy, and they then moderated the volume of their production.

172.    Concurrent with the entry of the Taiwanese firms, the Koreans, just as the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.  Two of the largest Korean firms announced plans to invest billions in Taiwanese TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

173.    Newer generation fabs reduced costs and provided opportunities for additional profits at cartelized prices.  In fact, a leading industry research house indicated that LCD manufacturers would pour $5 billion into new manufacturing in 2000, roughly equivalent to the amount the industry spent in the previous three years combined.

174.    In October 2000, The Korea Herald reported that, "IDC estimates that the global LCD supply is one to two percent in excess and the unbalance will rise to seven percent next year as manufacturers continue to book their output."

39

175.    Then, despite what was billed as massive and growing overcapacity in 2000 and early 2001, prices of TFT-LCD panels stopped declining in mid-2001, and actually increased.  In late 2001, a senior official at LG Display stated that the global market faced a supply shortage, and that this would "rapidly resolve the industry's oversupply and improve its profitability."  Similarly, industry insiders suggested that the price increases were the result of an inability to meet increased demand.  However, published data for 2001 showed that several conspirators were operating their fabs significantly below capacity.  For example, Chunghwa had a 75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU Optronics) had a 52 percent utilization rate.  Based on the data indicating reduced capacity utilization during a time of rising prices and supposedly tight supply, the Taiwanese firms had begun actively cooperating with Japanese and Korean incumbents to restrict supply.  Again, conspirators reacted to the price trough by conspiring to fix prices.  This agreement was reached in part at the bilateral and group meetings described above.

176.    The rise in prices made no economic sense at this point in time and was the product of the conspirators' setting the price of TFT-LCD Products by agreement.  First, the conspirators were bringing new plants on line that utilized larger motherglass, which was more cost effective.  Second, as reported by an industry source, the variable cost of producing TFT-LCDs was declining during the latter part of 2001 and into 2002.  With lower production costs and capacity to spare, it made little economic sense for conspirators not to utilize their full capacity other than through an agreement by them not to do so.

**5.      2002 - 2003**

177.    Prices continued to rise from the second half of 2001 through the second half of 2002.  Industry analysts attributed these price increases to a "larger-than-expected panel shortage," despite continuing capacity expansion.  In reality, the price increases were the result of agreements reached in the crystal meetings and bilateral discussions described above.

178.    By the second half of 2002, the cartel's success at propping up prices led to lagging demand, and the cartel's response was to let prices level off and even begin to fall.

179.    Throughout 2002, industry leaders shifted to fifth generation motherglass production technology.  According to officials at Samsung, "[t]he new fifth-generation facilities offer panels that

COMPLAINT

are 11.5 times bigger in size than those of the first-generation production line, while production cost is 20 percent lower than the fourth-generation counterpart because of the decrease in number of necessary parts."

180. Industry analysts took note of the unusual trends in the pricing of TFT-LCD Products. In February 2004, CNET.com quoted an analyst from IDC, a market research firm, as saying that, "LCD is one of the few [markets] where things have actually gone up in price." As described above and as further detailed below, conspirators explained these price increases with false statements about market conditions in order to cover up the conspiracy.

181. During five consecutive quarters in 2003 and 2004, TFT-LCD Product prices rose significantly. AU Optronics reported that the price for certain of its TFT-LCD Products increased 28 percent between the second quarter of 2003 and the second quarter of 2004. Similarly, LG Display reported that its pricing increased by 21 percent over the same period.

182. These soaring prices resulted in similar increases in the profits reaped by the TFT-LCD Product manufacturers. For example, the eight largest TFT-LCD Product manufacturers reported a collective profit increase of 740 percent between the second quarter of 2003 and the second quarter of 2004. These record profits resulted from conspirators' collective action to fix, raise, maintain or stabilize the price of TFT-LCD Products. Again, the sharing of information about price and production, the under-utilization of capacity, and restraints on output drove up the prices of TFT-LCDs.

183. Around this time, industry analysts suggested that there were too many competitors in the TFT-LCD Product marketplace. Some industry participants went as far as overtly suggesting that the industry should seek to curtail supply through mergers. These suggestions were carried out. Significant consolidation and collaboration among competitors in the TFT-LCD Product market occurred.

184. While TFT-LCD Product prices were increasing in late 2003, AU Optronics, Chi Mei, and HannStar decreased capacity utilization, as had been agreed to in crystal meetings.

41

185.    Consolidation and collaboration continued in 2003 as Chi Mei bought Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent stake in Japan's Fujitsu Display Technology.

186.    Despite the increased efficiency and costs savings of fifth generation fabs, the industry experienced higher prices in 2003, purportedly because of a shortage of the most popular sizes of TFT-LCD panels. In order to keep prices artificially high, conspirators chose not to operate at full capacity, nor to take advantage of lower variable costs.

### 6.    2004

187.    Pursuant to conspirators' agreement to fix and stabilize prices, prices continued to rise during the first half of 2004. In fact, between 2003 and mid-2004, panel prices increased for five consecutive quarters. Various types of crystal meetings were ongoing during this period.

188.    The cartel's success at raising prices slowly dampened demand. In response, the cartel allowed prices to once again level off and then to begin to decline in the second half of 2004. During this period of time, the market for TFT-LCD televisions started to grow, with the 32-inch panel representing approximately 9 percent of the market.

189.    In late 2004, AU Optronics reduced financial forecasts, claiming that overcapacity-driven price declines were eroding profits. AU Optronics publicly announced plans to reduce capacity at its sixth generation fabs by 30 percent and to delay a planned seventh generation facility.

190.    Consolidation and collaboration among and between competitors continued as Samsung and Sony launched their joint venture, named S-LCD Corp.

### 7.    2005

191.    Analysts widely predicted a continuing period of oversupply and declining prices throughout 2005. However, by the third quarter of 2005, it was clear that the industry was not facing oversupply, but rather was reaping the benefits of a panel shortage and stable, or increasing, panel prices.

192.    By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well. In 2005, 32-inch panels represented almost 27 percent of sales.

42

193.   Around this time, Samsung announced its intention to increase production of 40-inch TFT-LCD panels from 20,000 units in the second quarter to 150,000 units in the fourth quarter. An immediate increase to 100,000 units occurred the very next month. Samsung's ability to immediately increase output so drastically shows how quickly manufacturers could ramp up capacity and increase utilization.

194.   Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants from Samsung and LG Display being brought on line. However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent. The shortage came as a surprise to analysts.

195.   This shortage was the result of collusion among the conspirators. Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for TFT-LCD Products:

I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower. And I think in the past we did have some problem convincing our competitors doing the same thing. But in recent months, especially this year, actually, it did start to happen. I think that the industry understand[s] the benefit of keeping the capacity low. Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading. And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs. So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big. So, we think the industry become more mature. That is precisely what our competitors would do.

196.   Indeed, earlier that year, spokespersons for LG Display and Samsung had predicted that market stabilization.

197.   A Samsung presentation from November of 2005 made by Sang-Wan Lee, the President of Samsung's TFT-LCD Products business, noted that it was possible to "secure a reasonable amount of profit while following the industry leaders."

43

1    198.    These collusive actions were being perpetuated through the series of ongoing meetings
2    as alleged above.

3        **8.    2006 - Present**

4    199.    A temporary oversupply of TFT-LCD Products occurred in 2006, which had the effect
5    of reducing prices in the short term. Again, in the face of a price trough, the conspirators fixed and
6    stabilized prices through their cartel activities. On May 25, 2006, at a Taiwanese trade show, Mr.
7    Hsiung of AU Optronics stated publicly that his company was reducing production of those products in
8    order to avoid further price erosion. He expressed the view that his competitors should follow suit,
9    saying that production ought to be reduced by at least 15 percent. Eddie Chen, a spokesperson for Chi
10   Mei who was present at the trade show, promised to take similar steps in conjunction with his
11   company's peers. A June 13, 2006 article in Info World noted that as a result of Mr. Hsiung's
12   statements, "[t]he chatter is growing louder each day."

13   200.    Chi Mei was not the only one to follow AU Optronics' invitation to restrict the output
14   and increase the prices of TFT-LCD Products. In May of 2006, in discussions between executives of
15   the two companies, AU Optronics convinced Quanta Display, a company that it acquired in October of
16   2006, to reduce production of TFT-LCD Products. By June of 2006, LG Display also announced plans
17   to cut production of TFT-LCD Products.

18   201.    By the summer of 2006, this ongoing conspiracy was being effectuated through bilateral
19   meetings as alleged above.

20   202.    Despite the fact that certain of the conspirators may have cut back on, or discontinued,
21   their conspiratorial conduct in 2006 upon the commencement of the governmental investigations
22   described below, the impact of the conspiracy continues through the present. This carry-over in the
23   antitrust injury is due, in part, to the nature of the pricing mechanisms used for TFT-LCD Products.

24       **H.    The Role of Trade Associations During the Relevant Period**

25   203.    The TFT-LCD industry is served by several major trade organizations that put on
26   industry-wide meetings several times a year. These meetings have facilitated collusion, and the trade
27   associations have themselves functioned as a means for Defendants and their co-conspirators to
28   cooperate and discuss prices.

44

204. One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

205. South Korean manufacturers, including LG Display and Samsung, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

206. Japanese manufacturers of TFT-LCD Products have a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of TFT-LCD Products. Its members include Sharp, Toshiba, Hitachi, and a Japanese subsidiary of Samsung. Like the KODEMIA and TTLA, the SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

207. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium, but was renamed the "SID International Symposium and Business Conference." SID also puts on a long-running conference called the International Display Research Conference ("IDRC").

208.    The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO of AU Optronics. This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers." A representative of DisplaySearch also spoke about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources, and other industry experts. This was all followed by a "networking reception – sponsored by LG Philips LCD," to which all conference attendees were invited to participate.

209.    SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these discussions about the market were followed by a "networking reception." Among the attendees at SID 2004 were Bruce Berkoff of LG Display, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AU Optronics and Joel Pollack of Sharp. Senior executives from Sharp and Hitachi also attended.

210.    The SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle. Jun H. Souk, Executive Vice President of Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows: "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles. Efforts made in cost reduction, line-investment timing, and new market generation will be described."

211.    SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing." Among the attendees at SID 2005 were Bruce Berkoff of LG Display and Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display, Samsung, and Hitachi.

212.    The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held in March of

46

1  2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa,
2  Japan.

3      213.    Participants in the 2006 GFPC noted how successful the event was in promoting
4  information exchanges and "networking" among the conspirators. Or, as Dr. Hui Hsiung has said,
5  "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to
6  build connections across the supply chain and around the world . . . the GFPC plays a vital part in
7  building those connections and growing our business."

8      214.    Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of
9  Samsung, Shigaeki Mizushima of Sharp, Mr. Ogura of Toshiba Mobile, Yoshihide Fuji of Toshiba,
10  and Dr. Hui Hsiung of AU Optronics.

11      215.    As indicated by the public pronouncements, these trade association meetings facilitated
12  the conspiracy by giving Defendants and their co-conspirators further opportunities to discuss prices
13  and output.

14      **VI.    DELL'S PURCHASES OF TFT-LCD PRODUCTS**

15      216.    Dell has suffered a direct, substantial, and reasonably foreseeable injury as a result of
16  the conspiracy to raise, fix, or maintain the price of TFT-LCD Products at artificial levels. During the
17  Relevant Period, the conspiracy artificially inflated the price of TFT-LCD Products purchased by Dell,
18  causing Dell to pay higher prices for TFT-LCD Products than it would have paid in a competitive
19  market.

20      217.    During the Relevant Period, Dell purchased TFT-LCD Products directly from many, if
21  not all of the Defendants, and a number of Defendants' co-conspirators.

22      218.    During the Relevant Period, Dell also purchased TFT-LCD Products from third-party
23  systems integrators who currently are not alleged to have conspired with Defendants.

24      219.    The unlawful conspiracy described herein caused Dell to pay an overcharge for both the
25  TFT-LCD Products Dell purchased from Defendants or their co-conspirators and the TFT-LCD
26  Products Dell purchased from third-party systems integrators.

27
28

47

1    220.   During the Relevant Period, Dell also directed the purchase of TFT-LCD panels by
2  certain of its third-party systems integrators, including arranging for the prices to be paid by the
3  systems integrators to Defendants or their co-conspirators.

4    221.   During the Relevant Period, Dell purchased TFT-LCD Products from Defendants or
5  their co-conspirators and from third-party systems integrators, and received these TFT-LCD Products
6  in locations including Texas, North Carolina, Tennessee and Nevada.

7    222.   Dell's purchases support Dell's claims under the State laws of North Carolina,
8  Tennessee and Nevada, as set forth herein.

9    **VII.   FRAUDULENT CONCEALMENT**

10    223.   Dell had neither actual nor constructive knowledge of the facts supporting its claims for
11  relief despite diligence in trying to discover the pertinent facts. Dell did not discover, and could not
12  have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged
13  herein until December 2006, when investigations by the DOJ and other antitrust regulators became
14  public. Defendants and their co-conspirators engaged in a secret conspiracy that did not give rise to
15  facts that would put Dell on inquiry notice that there was a conspiracy to fix the prices of TFT-LCD
16  Products.

17    224.   The participants in the crystal meetings agreed to keep the meetings secret. In some
18  instances, the location of the meeting was circulated only the day before in an effort to avoid detection.
19  In fact, the top executives who attended the CEO and commercial crystal meetings agreed to stagger
20  their arrivals and departures at such meetings to avoid being seen in public with each other and with
21  the express purpose and effect of keeping them a secret. Moreover, when the participants in those
22  meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-
23  one. Furthermore, the participants agreed on what pretexts they would cite when questioned about
24  rising prices. The participants also agreed to lie to the media and report that their fabs were operating
25  at full capacity even when they were not, in order to create the appearance of a supply shortage.

26    225.   The affirmative acts of Defendants and their co-conspirators alleged herein, among
27  others, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a
28  manner that precluded detection.

48

226. Defendants and their co-conspirators have used a variety of other purportedly market-based explanations for price increases in order to conceal their conspiracy.

227. In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization: "Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

228. Also in 1999, Bock Kwon (high-ranking executive with LG Display who pled guilty in the United States for his role in the global conspiracy to fix prices in the sale of TFT-LCD Products) and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases resulted from "acute" shortages.

229. On February 4, 2001, Bruce Berkoff, Executive Vice President at LG Display, was quoted by News.com as saying that price increases were due to shortages. He claimed, "demand grew so fast that the supply can't keep up."

230. In the latter half of 2001, Koo Duk-Mo, an executive at LG Display who was criminally indicted for his participation in the global conspiracy to fix prices of TFT-LCD Products, predicted a 10 to 15 percent price increase, purportedly resulting from increased demand during the holiday season.

231. Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin, President of AU Optronics, offered another rationale for the 2001 price increase in an interview for the *Taiwan Economic News* in October 2001. They blamed "component shortages due to the late expansion of 5th generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors."

232. In a PowerPoint shown to investors on September 16, 2003, Toshiba gave the following pretextual explanation for its soaring revenues: "LCDs: Profitability recovered faster than originally expected." A question-and-answer sheet released to investors that same day offered a better clue to its participation in the ongoing conspiracy: "Q4. How are recent prices for LCDs . . .? [Answer:] They remain high."

49

1  233.  These explanations were pretextual and each served to cover up the conspiracy.  Later
2  price increases were explained by industry leaders as derived from new demand for LCD televisions.
3  In 2005, Koo Duk-Mo of LG Display who, as noted above, has now been indicted for his role in the
4  conspiracy, stated "[w]e are seeing much stronger demand for large-size LCD TVs than expected, so
5  LCD TV supply is likely to remain tight throughout the year."

6  234.  As a result of Defendants' and their co-conspirators' fraudulent concealment of their
7  conspiracy, the running of any statute of limitations has been tolled with respect to any of Dell's claims
8  arising from the anticompetitive conduct alleged in this Complaint.

9  **VIII.  DELL'S CONTRACTS WITH HITACHI, SHARP AND TOSHIBA**

10  **A.  Hitachi MPA**

11  235.  Dell Products, L.P. and Hitachi, Ltd. entered a Master Purchase Agreement ("Hitachi
12  MPA"), which agreement sets forth the terms and conditions by which Dell Products, L.P. and all of
13  Dell's subsidiaries and corporate affiliates purchase TFT-LCD Products from Hitachi, Ltd.

14  236.  Since it became effective, both Dell and Hitachi have treated the Hitachi MPA as
15  applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries,
16  from Hitachi Ltd. and any of its affiliates and subsidiaries regardless of the specific parties which
17  entered the Hitachi MPA or which sold or purchased the TFT-LCD Products.

18  237.  The Hitachi MPA requires Hitachi to comply with all applicable laws, orders and
19  regulations of any governmental authority with jurisdiction over its activities in connection with the
20  agreement.

21  238.  As described throughout this Complaint, Hitachi failed to comply with all applicable
22  laws in connection with its provision of TFT-LCD Products to Dell, including both U.S. and foreign
23  antitrust and unfair competition laws.  Accordingly, Hitachi has breached the Hitachi MPA.

24  239.  The Hitachi MPA permits Dell to sue for damages for breach, an order requiring
25  specific performance, or for any other remedy available at law or in equity.  Therefore, Dell is entitled
26  to damages and all other available remedies on account of Hitachi's breach.

27

28

50

**B.    Sharp MPA**

240.    Dell Products, L.P. and Sharp Corporation entered a Master Purchase Agreement ("Sharp MPA") which agreement sets forth the terms and conditions by which Dell Products, L.P. and all of Dell's subsidiaries and corporate affiliates purchase TFT-LCD Products from Sharp Corporation.

241.    Since it became effective, both Dell and Sharp have treated the Sharp MPA as applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sharp Corporation and any of its affiliates and subsidiaries regardless of the specific parties which entered the Sharp MPA or which sold or purchased the TFT-LCD Products.

242.    The Sharp MPA requires Sharp to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the agreement.

243.    As described throughout this Complaint, Sharp failed to comply with all applicable laws in connection with its provision of TFT-LCD Products to Dell, including both U.S. and foreign antitrust and unfair competition laws.  Accordingly, Sharp has breached the Sharp MPA.

244.    The Sharp MPA permits Dell to sue for damages for breach, an order requiring specific performance, or for any other remedy available at law or in equity.  Therefore, Dell is entitled to damages and all other available remedies on account of Sharp's breach.

**C.    Toshiba MPA**

245.    Dell Products, L.P. and Toshiba Corporation entered a Master Purchase Agreement ("Toshiba MPA"), which agreement sets forth the terms and conditions by which Dell Products, L.P. and all of Dell's subsidiaries and corporate affiliates purchase TFT-LCD Products from Toshiba Corporation and its subsidiaries.

246.    Since it became effective, both Dell and Toshiba have treated the Toshiba MPA as applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries, from Toshiba Corporation and any of its affiliates and subsidiaries regardless of the specific parties which entered the Toshiba MPA or which sold or purchased the TFT-LCD Products.

1      247.    The Toshiba MPA requires Toshiba to comply with all applicable laws, orders and

2  regulations of any governmental authority with jurisdiction over its activities in connection with the

3  agreement.

4      248.    As described throughout this Complaint, Toshiba failed to comply with all applicable

5  laws in connection with its provision of TFT-LCD Products to Dell, including both U.S. and foreign

6  antitrust and unfair competition laws. Accordingly, Toshiba has breached the Toshiba MPA.

7      249.    The Toshiba MPA permits Dell to sue for damages for breach, an order requiring

8  specific performance, or for any other remedy available at law or in equity. Therefore, Dell is entitled

9  to damages and all other available remedies on account of Toshiba's breach.

10                                          **COUNT I**

11                          **CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

12                               **(AGAINST ALL DEFENDANTS)**

13     250.    Dell incorporates by reference all the above allegations as if fully set forth herein.

14     251.    Beginning approximately January 1, 1996, the exact date being unknown to Dell and

15  exclusively within the knowledge of Defendants and their co-conspirators, Defendants and their co-

16  conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain

17  trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially

18  reducing or eliminating competition.

19     252.    In particular, Defendants and their co-conspirators combined and conspired to raise, fix,

20  maintain or stabilize the prices of TFT-LCD Products.

21     253.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices for TFT-

22  LCD Products were raised, fixed, maintained and stabilized.

23     254.    The contract, combination or conspiracy among Defendants and their co-conspirators

24  consisted of a continuing agreement, understanding, and concerted action among the Defendants and

25  their co-conspirators.

26     255.    For purposes of effectuating their contract, combination or conspiracy, Defendants and

27  their co-conspirators actually did those things they contracted, combined, or conspired to do, including:

28

                                              52

1    a.    participating in meetings and conversations to discuss the prices and supply of TFT-
2  LCD Products;

3    b.    communicating in writing and orally to fix target prices, floor prices, and price ranges
4  for TFT-LCD Products;

5    c.    agreeing to manipulate prices and supply of TFT-LCD Products in a manner that
6  deprived purchasers of TFT-LCD Products, including Dell, of free and open competition;

7    d.    issuing price announcements and price quotations in accordance with the agreements
8  reached;

9    e.    selling TFT-LCD Products to customers at non-competitive prices;

10    f.    exchanging competitively sensitive information in order to facilitate their conspiracy;

11    g.    agreeing to maintain or lower production capacity; and

12    h.    providing false statements to the public to explain increased prices for TFT-LCD
13  Products.

14    256.    As a result of Defendants' and their co-conspirators' unlawful conduct, Dell was injured
15  in its business and property in that it paid more for TFT-LCD Products than it otherwise would have
16  paid in the absence of the unlawful conduct.

17                                          **COUNT II**

18          **CLAIM FOR UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS**

19                                **(AGAINST ALL DEFENDANTS)**

20    257.    Dell incorporates by reference all the above allegations as if fully set forth herein.

21    258.    Defendants have been unjustly enriched through overpayments by Dell and the resulting
22  profits.

23    259.    Under common law principles of unjust enrichment, Defendants and their co-
24  conspirators should not be permitted to retain the benefits conferred on them by overpayments.

25    260.    Dell seeks disgorgement of all profits resulting from its overpayments and
26  establishment of a constructive trust from which Dell may seek restitution.

27

28

                                              53

1        **COUNT III**

2        **VIOLATION OF NEVADA REV. STAT. ANN. §§598A, et. seq.**

3        **(AGAINST ALL DEFENDANTS)**

4        261.    Dell incorporates by reference all the above allegations as if fully set forth herein.

5        262.    Defendants' and their co-conspirators' combinations or conspiracies had the following

6    effects:

7        a.    TFT-LCD Product price competition was restrained, suppressed, and eliminated

8    throughout Nevada;

9        b.    TFT-LCD Product prices were raised, fixed, maintained and stabilized at artificially

10   high levels throughout Nevada;

11       c.    Dell was deprived of free and open competition; and

12       d.    Dell paid supracompetitive, artificially inflated prices for TFT-LCD Products.

13       263.    During the Relevant Period, Defendants' and their co-conspirators' illegal conduct

14   substantially affected Nevada commerce.

15       264.    As a direct and proximate result of Defendants' and their co-conspirators' unlawful

16   conduct, Dell has been injured in its business and property and is threatened with further injury.

17       265.    By reason of the foregoing, Defendants and their co-conspirators have entered into

18   agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, et seq.  Accordingly,

19   Dell seeks all relief available under Nevada Rev. Stat. Ann. §§ 598A, et seq.

20       **COUNT IV**

21       **VIOLATION OF NORTH CAROLINA ANTITRUST LAW,**

22       **N.C. GEN. STAT. §§ 75-1, et seq.**

23       **(AGAINST ALL DEFENDANTS)**

24       266.    Dell incorporates by reference all the above allegations as if fully set forth herein.

25       267.    Defendants' and their co-conspirators' combinations or conspiracies had the following

26   effects:

27       a.    TFT-LCD Product price competition was restrained, suppressed, and eliminated

28   throughout North Carolina;

54

COMPLAINT

1      b.     TFT-LCD Product prices were raised, fixed, maintained and stabilized at artificially

2 high levels throughout North Carolina;

3      c.     Dell was deprived of free and open competition; and

4      d.     Dell paid supracompetitive, artificially inflated prices for TFT-LCD Products.

5      268.    During the Relevant Period, Defendants' and their co-conspirators' illegal conduct

6 substantially affected North Carolina commerce.

7      269.    As a direct and proximate result of Defendants' and their co-conspirators' unlawful

8 conduct, Dell has been injured in its business and property and is threatened with further injury.

9      270.    By reason of the foregoing, Defendants and their co-conspirators have entered into

10 agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, et seq. Accordingly,

11 Dell seeks all relief available under North Carolina Gen. Stat. §§ 75-1, et seq.

## COUNT V

### VIOLATION OF NORTH CAROLINA UNFAIR COMPETITION AND CONSUMER PROTECTION LAW, N.C. GEN. STAT. §§ 75-1.1, et seq.

### (AGAINST ALL DEFENDANTS)

16      271.    Dell incorporates by reference all the above allegations as if fully set forth herein.

17      272.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade

18 or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive

19 levels, the prices at which TFT-LCD Products were sold, distributed or obtained in North Carolina and

20 took efforts to conceal their agreements from Dell.

21      273.    The conduct of the Defendants and their co-conspirators described herein constitutes

22 consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which

23 resulted in consumer injury and broad adverse impact on the public at large, and harmed the public

24 interest of North Carolina consumers, including Dell, in an honest marketplace in which economic

25 activity is conducted in a competitive manner.

26      274.    Defendants' and their co-conspirators' unlawful conduct had the following effects:

27      a.     TFT-LCD Product price competition was restrained, suppressed, and eliminated

28 throughout North Carolina;

1       b.     TFT-LCD Product prices were raised, fixed, maintained and stabilized at artificially

2 high levels throughout North Carolina;

3       c.     Dell was deprived of free and open competition; and

4       d.     Dell paid supracompetitive, artificially inflated prices for TFT-LCD Products.

5       275.     During the Relevant Period, Defendants' and their co-conspirators' illegal conduct

6 substantially affected North Carolina commerce.

7       276.     During the Relevant Period, Defendants and their co-conspirators directly, or indirectly

8 and through affiliates they dominated and controlled, manufactured, sold and/or distributed TFT-LCD

9 Products in North Carolina.

10       277.     Dell seeks actual damages for its injuries caused by these violations in an amount to be

11 determined at trial and is threatened with further injury. Defendants and their co-conspirators have

12 engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina

13 Gen. Stat. § 75-1.1, et seq., and, accordingly, Dell seeks all relief available under that statute.

**COUNT VI**

**VIOLATION OF TENNESSEE CODE ANN. §§ 47-25-101, et seq.**

**(AGAINST ALL DEFENDANTS)**

17       278.     Dell incorporates by reference all the above allegations as if fully set forth herein.

18       279.     Defendants' and their co-conspirators' combinations or conspiracies had the following

19 effects:

20       a.     TFT-LCD Product price competition was restrained, suppressed, and eliminated

21 throughout Tennessee;

22       b.     TFT-LCD Product prices were raised, fixed, maintained and stabilized at artificially

23 high levels throughout Tennessee;

24       c.     Dell was deprived of free and open competition; and

25       d.     Dell paid supracompetitive, artificially inflated prices for TFT-LCD Products.

26       280.     During the Relevant Period, Defendants' and their co-conspirators' illegal conduct

27 substantially affected Tennessee commerce.

28

56

1  281.   As a direct and proximate result of Defendants' and their co-conspirators' unlawful
2  conduct, Dell has been injured in its business and property and is threatened with further injury.

3  282.   By reason of the foregoing, Defendants and their co-conspirators have entered into
4  agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, et seq.
5  Accordingly, Dell seeks all relief available under Tennessee Code Ann. §§ 47-25-101, et seq.

6  ## COUNT VII

7  ## BREACH OF CONTRACT

8  ## (AGAINST HITACHI)

9  283.   Dell incorporates by reference all the above allegations as if fully set forth herein.

10  284.   Pursuant to the Hitachi MPA with Dell, Hitachi agreed to comply with all applicable
11  laws, orders and regulations of any governmental authority with jurisdiction over its activities in
12  connection with the provision of TFT-LCD Products to Dell.

13  285.   Hitachi has treated the Hitachi MPA as applicable to all TFT-LCD Products purchased
14  by Dell Inc., and any of its affiliates and subsidiaries, from Hitachi and any of its affiliates and
15  subsidiaries, respectively, regardless of the specific parties which entered the initial agreement or
16  which sold or purchased the TFT-LCD Products.

17  286.   As set forth herein, Hitachi did not comply with all applicable laws in providing TFT-
18  LCD Products to Dell, and accordingly Hitachi's sales of TFT-LCD Products to Dell since the
19  effective date of the Hitachi MPA and throughout the remainder of the Relevant Period, breached the
20  Hitachi MPA.

21  287.   Dell is entitled to damages for Hitachi's breach in the amount of the overcharges it paid
22  to Hitachi for all TFT-LCD purchases after the effective date of the Hitachi MPA and throughout the
23  Relevant Period.

24
25
26
27
28

57

**COUNT VIII**

**BREACH OF CONTRACT**

**(AGAINST SHARP)**

288. Dell incorporates by reference all the above allegations as if fully set forth herein.

289. Pursuant to the Sharp MPA with Dell, Sharp agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of TFT-LCD Products to Dell.

290. Sharp has treated the Sharp MPA as applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries, from Sharp and any of its affiliates and subsidiaries, respectively, regardless of the specific parties which entered the initial agreement or which sold or purchased the TFT-LCD Products.

291. As set forth herein, Sharp did not comply with all applicable laws in providing TFT-LCD Products to Dell, and accordingly Sharp's sales of TFT-LCD Products to Dell since the effective date of the Sharp MPA and throughout the remainder of the Relevant Period, breached the Sharp MPA.

292. Dell is entitled to damages for Sharp's breach in the amount of the overcharges it paid to Sharp for all TFT-LCD purchases after the effective date of the Sharp MPA and throughout the Relevant Period.

**COUNT IX**

**BREACH OF CONTRACT**

**(AGAINST TOSHIBA)**

293. Dell incorporates by reference all the above allegations as if fully set forth herein.

294. Pursuant to the Toshiba MPA with Dell, Toshiba agreed to comply with all applicable laws, orders and regulations of any governmental authority with jurisdiction over its activities in connection with the provision of TFT-LCD Products to Dell.

295. Toshiba has treated the Toshiba MPA as applicable to all TFT-LCD Products purchased by Dell Inc., and any of its affiliates and subsidiaries, from Toshiba and any of its affiliates and subsidiaries, respectively, regardless of the specific parties which entered the initial agreement or which sold or purchased the TFT-LCD Products.

COMPLAINT

1    296.    As set forth herein, Toshiba did not comply with all applicable laws in providing TFT-

2 LCD Products to Dell, and accordingly Toshiba's sales of TFT-LCD Products to Dell since the

3 effective date of the Toshiba MPA and throughout the remainder of the Relevant Period, breached the

4 Toshiba MPA.

5    297.    Dell is entitled to damages for Toshiba's breach in the amount of the overcharges it paid

6 to Toshiba for all TFT-LCD purchases after the effective date of the Toshiba MPA and throughout the

7 Relevant Period.

8                    **PRAYER FOR RELIEF**

9    298.    WHEREFORE, Dell prays that the Court enter judgment on its behalf, adjudging and

10 decreeing that:

11    a.    Defendants and their co-conspirators engaged in a contract, combination, and

12 conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Dell was injured in its

13 business and property as a result of Defendants' and their co-conspirators' violations;

14    b.    Defendants committed acts of unjust enrichment as set forth herein;

15    c.    Defendants violated state antitrust, unfair competition and consumer protection laws as

16 set forth herein;

17    d.    Sharp, Hitachi and Toshiba breached their contracts with Dell for the supply of TFT-

18 LCD Products;

19    e.    Dell shall recover damages it sustained, as provided by the federal antitrust laws, and a

20 joint and several judgment in favor of Dell shall be entered against Defendants and their co-

21 conspirators in an amount to be trebled in accordance with such laws;

22    f.    Dell shall recover damages it sustained, as provided by the state antitrust, unfair

23 competition and consumer protection laws set forth herein, and a joint and several judgment in favor of

24 Dell shall be entered against Defendants and their co-conspirators;

25    g.    Dell be awarded compensatory damages for Sharp's, Hitachi's and Toshiba's breaches

26 of their contracts with Dell;

27    h.    Dell be awarded restitution, including disgorgement of profits obtained by Defendants

28 and their co-conspirators as a result of their acts of unfair competition and acts of unjust enrichment;

59

i.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

j.      Dell shall be awarded pre-judgment and post-judgment interest;

k.      Dell shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

l.      Dell shall receive such other or further relief as may be just and proper.

## IX.    JURY TRIAL DEMANDED

299.    Pursuant to Federal Rule of Civil Procedure 38(b), Dell demands a trial by jury of all of the claims asserted in this Complaint so triable.

Date: March 12, 2010

COMPLAINT

1

2   Respectfully submitted,

3   By: Steven D. Hemminger (SBN 110065)
    steve.hemminger@alston.com
    **ALSTON + BIRD LLP**
4   Two Palo Alto Square
    3000 El Camino Real, Suite 400
5   Palo Alto, California 94306
    Telephone: (650) 838-2000
6   Facsimile: (650) 838-2001

7   Michael P. Kenny, Esq.
    Georgia Bar No. 415064
8   mike.kenny@alston.com
    Debra D. Bernstein, Esq.
9   Georgia Bar No. 054998
    debra.bernstein@alston.com
10  Rodney J. Ganske, Esq.
    Georgia Bar No. 283819
11  rod.ganske@alston.com
    Elizabeth H. Jordan, Esq.
12  Georgia Bar No. 415161
    elizabeth.jordan@alston.com
13  Matthew D. Kent, Esq.
    Georgia Bar No. 526272
14  matthew.kent@alston.com
    **ALSTON + BIRD LLP**
15  1201 West Peachtree Street
    Atlanta, Georgia 30309-3424
16  Tel: (404) 881-7000
    Facsimile: (404) 881-7777
17
    *Attorneys for Plaintiffs Dell Inc. and Dell*
18  *Products L.P.*

19

20

21

22

23

24

25

26

27

28

61

COMPLAINT